**BROWN**RUDNICK

ROBERT J. STARK, ESQ.
direct dial: (212) 209-4862
rstark@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

March 22, 2006

<u>**VIA E-MAIL, FACSIMILE AND OVERNIGHT COURIER**</u>

The Honorable Deirdre A. Martini
United States Trustee
33 Whitehall Street, 21st Floor
New York, NY  10004

   **RE:** <u>In re Oneida Ltd., et al.,</u>
      **Ch. 11 Case No. 06-10489-alg (Bankr. S.D.N.Y.)**

Dear Ms. Martini:

   This firm is counsel to an *ad hoc* committee (the "<u>*Ad Hoc* Committee</u>") comprised of those institutions listed on <u>Exhibit A</u> hereto, which collectively own 2,565,007  shares of common stock issued by Oneida Ltd. ("<u>Oneida</u>" or the "<u>Company</u>").  We write to request that the United States Trustee appoint an Official Committee of Equity Security Holders (an "<u>Official Equity Committee</u>") in the Oneida Chapter 11 cases pursuant to Bankruptcy Code Section 1102(a)(1).   This request is joined by another large institution (also identified on <u>Exhibit A</u>) holding 1,765,000 shares, meaning that institutions collectively holding 4,330,007 shares (or about 9.3%) of Oneida stock believe such appointment is warranted.

   An Official Equity Committee is necessary and appropriate under the facts of this case and should be appointed with all deliberate speed. *As described below, analysis of Oneida's financial projections and recent comparable M&A transactions in this rapidly consolidating industry suggest that there is ample value in Oneida to fully satisfy the claims of all creditors, and support a recovery of more than $70 million for the equity holders. The Company's Chapter 11 filings are being carefully orchestrated to squeeze out minority shareholders and to ensure that they do not receive their rightful distribution of estate value.*

**I.**  <u>**Oneida Is Solvent.**</u>

   Incorporated in 1880, Oneida is one of the world's largest sourcing and distribution companies, possessing one of the world's most recognized brand names and an estimated 35% share of the flatware and tableware market.   While it has experienced financial difficulties in transitioning its business model from domestic manufacturing to foreign sourcing, the Company has turned the corner.  The Company's own Chapter 11 disclosure statement (the "<u>Disclosure Statement</u>") forecasts positive free cash flow of $17.3 million

**BR**

starting in 2007, growing to $24.6 million in 2008, $23.4 million in 2009, $30.9 million in 2010, and $30.5 million in 2011. **A conservative discounted cash flow analysis of these projections suggests that Oneida's businesses are worth between $280 million and $320 million – values far in excess of the $253.5 million face amount of the Company's principal indebtedness.**[1]

Comparable company transactions in a rapidly consolidating industry environment provide an alternative valuation reference. An analysis of recent comparable company transactions suggests an enterprise valuation for Oneida in the range of $275 million to $325 million, implying a full recovery for creditors with residual equity value of up to $71.5 million.[2] This conclusion is based on M&A activity involving companies with arguably weaker brand recognition or, stated differently, does not incorporate a reasonable valuation premium for Oneida's strong branding or synergies.[3]

The establishment of Official Equity Committee is not dependent on the foregoing valuation arguments, it is a necessary pre-condition to their being appropriately heard in the context of these Chapter 11 cases.[4]

---

[1]    This analysis is provided in the presentation prepared by Imperial Capital LLC ("Imperial") that is attached hereto as Exhibit B.

[2]    In recent weeks, Lifetime Brands, Inc. ("Lifetime") announced an agreement to acquire Syratech Corporation ("Syratech"), a major designer, importer and manufacturer of competitive tabletop products. Lifetime's acquisition of Syratech was based on a price representing 0.36 times Syratech's 2005 revenues. A sale of Oneida's Consumer and International business units at a similar multiple would generate proceeds in excess of $65 million which, when added to the valuable core Foodservice business unit (at 7.5 times 2005 EBITDA), would support a mid-cash valuation in excess of $280 million.

[3]    The announcement of the Syratech transaction follows Lifetime's acquisition last year of tabletop manufacturer Pfaltzgraff Co., as well as certain tabletop assets from Salton, Inc. Also, in September 2005, Department 56, Inc. acquired Lenox Group, Inc., a major designer and retailer of tableware and ceramic collectibles. The consolidating industry environment has been observed by many Wall Street participants and has been reported widely (an example of one such article, entitled "Jarden, Lifetime Set Fast Pace for M&A Surge that's Far from Over," is attached hereto as Exhibit C)

[4]    The case law suggests that, when insolvency is in question, an Official Equity Committee should be appointed and given a reasonable opportunity to explore whether there is equity value. See, e.g., In re AM Int'l, Inc., 203 B.R. 898, 902 (D. Del. 1996) (bankruptcy court appointed an official equity committee over creditors'

## II. The Company Will Not And/Or Is Not Positioned To Preserve And Protect Minority Shareholder Value.

### A. Pre-Petition, The Company Refused To Meet And Confer With Minority Shareholders Over The Terms Of Its Restructuring.

On December 20, 2005 (i.e., three months before its Chapter 11 filing), this firm sent a letter to Oneida's Board of Directors on behalf of Jordan Capital, a significant Oneida shareholder and a member of the *Ad Hoc* Committee, requesting that the Company "initiate a meaningful dialog between the Company, Jordan Capital and one or more additional significant stockholders to discuss a strategy which will alleviate the financial burden on the Company and enhance stockholder value." A copy of the December 20th letter is attached hereto as Exhibit D.

On December 21, 2005, Oneida's counsel sent in response a seven sentence letter, culminating with: "At this time, however, the Company is not in a position to schedule a meeting with Jordan Capital but will consider such a meeting at the appropriate juncture." A copy of the Company's December 21st letter is attached hereto as Exhibit E. *The Company has systematically excluded its equity stakeholders from participation in this restructuring, in contravention of its fiduciary duties.*

### B. Rather, The Company Negotiated The Plan With Insiders And Conflicted Parties-In-Interest.

Oneida filed its Chapter 11 petition after having pre-negotiated a plan of reorganization with certain of its creditors (the "Pre-Negotiated Plan"). The Pre-Negotiated Plan contemplates: (a) refinancing at favorable rates "Tranche A" secured debt (in the aggregate outstanding amount of $115.3 million); (b) distribution of 100% of the common stock of reorganized Oneida to holders of "Tranche B" secured debt (in the aggregate outstanding amount of $97.6 million); and (c) all existing Oneida common and preferred stock will be cancelled and the holders of such stock will receive no recovery.

To evaluate the fairness of the Pre-Negotiated Plan, it is critical to understand the negotiating dynamics culminating in the plan. As disclosed in the "first-day" affidavit of Terry G. Westbrook, the Company experienced an out-of-court debt restructuring in 2004,

---

objection because there was considerable question whether the debtor was in fact insolvent); In re Wang Laboratories, 149 B.R. 1 (Bankr. D. Mass. 1992) (court appointed official equity committee in light of good faith dispute over whether the debtor was in fact insolvent); see also 7 COLLIER ON BANKRUPTCY ¶ 1102.03[2][a] 15th ed. (the solvency of the debtor is a threshold consideration but should not be the only factor, or even the principal factor, in deciding whether to appoint a committee of equity security holders).

pursuant to which secured lenders were provided with the Term A and Term B secured debt, as well as 62% of Oneida's common stock. Thereafter, the Company's lenders (acting as majority shareholders) elected their representatives to Oneida's Board of Directors. As such, the current Oneida Board is comprised of 100% of Term A and Term B lender designees, including a former senior executive of JPMorgan Chase – the Agent for the Term A and Term B lenders, as well as the Debtors' proposed post-petition lender. Thus, the Company did not negotiate the Pre-Negotiated Plan at arms'-length but, rather, sat on the same side of the negotiating table with its negotiating counter-parties. The obvious conflict of interest of those formulating the Pre-Negotiated Plan was the subject of, among other commentary, the Wall Street analyst's report attached hereto as Exhibit F.

Moreover, in negotiating the Pre-Negotiated Plan, Oneida was advised by what appears to be a conflicted financial advisor, Credit Suisse Securities (USA) LLC ("Credit Suisse"). In the Company's application to retain Credit Suisse as its post-petition financial advisor, it is disclosed that Credit Suisse has a pecuniary interest in the Pre-Negotiated Plan (a) as proposed exit financier for Oneida, (b) by facilitating trades of Oneida debt and/or equity, and (c) by shorting almost 81,000 shares of Oneida common stock. The application also disclosed that Credit Suisse provides investment banking and/or financial advisory services to holders of the Term A and Term B debt, as well as their Agent, JPMorgan Chase.

In light of the above, only an Official Equity Committee can ensure that minority shareholders are treated fairly and appropriately in the Chapter 11 process and are not over-run by an out-of-control plan process marred by inside dealing.

## III.   An Official Equity Committee Is Necessary To Serve As An Effective Case Counter-Balance For Oneida.

Unlike most Chapter 11 cases, Oneida's restructuring is not going to be shouldered by unsecured creditors. The Company does not have any unsecured bond debt and, if its several motions for authority to satisfy pre-petition trade debt are granted, Oneida may not have any remaining unsecured trade debt. Moreover, under the Pre-Negotiated Plan, unsecured debt is to be paid in full and pension-related claims of the Pension Benefit Guaranty Corporation (the "PBGC") are to be satisfied with a $3 million promissory note.[5] Thus, it does not appear that unsecured creditors will have a meaningful role in these Chapter 11 cases.

---

[5]    The Company represents in its disclosure statement that, based on waivers received from the Internal Revenue Service, its pension plan under-funding liabilities now approximate $33 million. The *Ad Hoc* Committee has not been afforded an opportunity to diligence such liability, but has reason to believe that such assessment is substantially overstated. See, e.g., PBGC v. Belfance (In re CSC Indus., Inc.), 232 F.3d 505 (6th Cir. 2000) (PBGC claims for pension plan under-funding must be reduced by a "prudent investor" present value factor, resulting in a 96% claim reduction), cert. denied, 534 U.S. 819 (2001); PBGC v. CF&I Fabricators of Utah,

Rather, the Company proposes that the restructuring should be borne by minority shareholders. Under the Pre-Negotiated Plan, Term B debt is converted into more valuable equity, and minority shareholders receive nothing. It is not hard to imagine a very Machiavellian strategy at play, where the Term B lenders (with active assistance of the lenders' representatives on Oneida's Board and an economically interested Credit Suisse) effectively credit-bid their debt for 100% of the Company's stock and, post-consummation, sell Oneida in whole or in part to realize value now rightfully belonging to minority shareholders.

Absent an Official Equity Committee, there is a very good chance that *Oneida's case will appear from hindsight like a rigged proceeding*, which has been a significant problem in other large Chapter 11 cases. For example, in the National Gypsum Company bankruptcy, the debtor and certain creditors pressed for a valuation that wiped out equity and left junior bondholders with limited value in the form of warrants. Almost immediately following the company's emergence from bankruptcy, the valuation proved wildly incorrect, and its stock skyrocketed in market value from the $350 million fixed at plan confirmation to almost $1 billion. As a result of that dramatic undervaluing of the debtor, the junior bondholders (whose claims totaled nearly $540 million) were left post-emergence only with certain warrants worth approximately $30 million, while the senior bondholders received stock worth more than triple their original claims. Substantial post-consummation litigation ensued. Although the litigation was eventually dismissed as a post-consummation collateral attack on the plan, see Prostok v. Browning, 165 S.W.3d 336 (Tex. 2005), the case underscores the importance of a close examination of all surrounding facts and the motives behind a Chapter 11 plan *before* the plan is brought to the bankruptcy court for confirmation. See Amer. United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 145 (1940) ("The responsibility of the court entails scrutiny of the circumstances surrounding [plan] acceptances, the special or ulterior motives which may have induced them, the time of acquiring the claims so voting, the amount paid therefore, and the like.").

Under the circumstances, an Official Equity Committee should be appointed to serve as Oneida's primary case counter-balance.

---

Inc. (In re CF&I Fabricators of Utah, Inc.), 150 F.3d 1293 (10th Cir. 1998) (same rule respecting PBGC claim allowance), cert. denied, 526 U.S. 1145 (1999). Nevertheless, as indicated above, there is still substantial equity value available if the Bankruptcy Court sustains a $33 million claim for the PBGC in these cases.

## IV.    An Official Equity Committee Must be Appointed Immediately.

Oneida is pressing hard for a quick confirmation of the Pre-Negotiated Plan. The Company is seeking rapid approval of the Disclosure Statement. Moreover, proposed post-petition financing (again, to be provided by JPMorgan Chase) requires the Company to provide an exit financing commitment (again, from Credit Suisse) by April 30, 2006. Time is of the essence.

## V.    Conclusion.

Based on the foregoing, we believe there is ample basis for the appointment of an Official Equity Committee to ensure fair treatment for Oneida's minority shareholders. We respectfully submit that shareholders are entitled to representation to ensure that estate value is maximized for the benefit of *all* stakeholders, not just existing creditors and the majority shareholders. Fair representation would afford stockholders a fair opportunity to investigate whether the Pre-Negotiated Plan is being proposed in good faith and to present their valuation case; its denial would effectively amount to ratification of the plan and to wrongfully misappropriate shareholder value.

Thank you for your prompt attention to this matter. We would very much welcome an opportunity to meet with you to discuss the contents of this letter and its attachments more fully and to provide you with any additional information and/or address any questions you may have. Otherwise, we anxiously await your response to this letter.

Very truly yours,

Robert J. Stark

Copy:    Douglas P. Bartner, Esq. (Counsel to Oneida)

## EXHIBIT A

### *AD HOC* COMMITTEE MEMBERS

| | |
|---|---|
| 1. | **JORDAN CAPITAL, L.P.**<br>767 Fifth Avenue<br>New York, NY 10153 |
| 2. | **LUTHER KING CAPITAL MANAGEMENT**<br>301 Commerce Street<br>Suite 1600<br>Fort Worth, TX 76102 |
| 3. | **WATER ISLAND CAPITAL, LLC**<br>650 5th Avenue, 6th Fl.<br>New York, NY 10019 |
| 4. | **XERION CAPITAL PARTNERS LLC**<br>450 Park Avenue # 27<br>New York, NY 10022 |

### SUPPORTING STOCKHOLDER

| | |
|---|---|
| 1. | **WHIPPOORWILL ASSOCIATES, INC.,**<br>**as agent for its discretionary accounts**<br>11 Martine Avenue<br>11th Floor<br>White Plains, NY 10606 |

**<u>EXHIBIT B</u>**

STRICTLY PRIVATE AND CONFIDENTIAL

# Oneida, Ltd.

*Presentation to the United States Trustee – Preliminary Valuation Overview*

**March 2006**



IMPERIAL
CAPITAL, LLC

# Table of Contents

I.    Executive Summary

II.   Valuation Approaches

III.  Financial Summary

IV.   Disclosure Statement Projections



2

# I. Executive Summary

# Executive Summary – Valuation Summary

*$ in millions*

## Valuation Summary

| Valuation Summary | Low | Mid | High |
|---|---|---|---|
| **Discounted Cashflow Analysis** [1] | $280.0 | $300.0 | $320.0 |
| *Weighting* | | *50.0%* | |
| Weighted Valuation | $140.0 | $150.0 | $160.0 |
| **LTM Comparable Transaction & Company Analysis** [2] | $275.0 | $300.0 | $325.0 |
| *Weighting* | | *50.0%* | |
| Weighted Valuation | $137.5 | $150.0 | $162.5 |
| **Sum of Weighted Valuations** | **$277.5** | **$300.0** | **$322.5** |

*(1) Based on projections in the Oneida Disclosure Statement dated 3/19/06.*
*(2) Last Twelve Months ended 10/29/05.*



# Executive Summary – Recovery Analysis

*$ in millions*

## Recovery Analysis

| Enterprise Valuation Range | $277.5 | $300.0 | $322.5 |
|---|---|---|---|
| Senior Secured | | 7.4 | |
| Term Loan A | | 115.3 | |
| Term Loan B | | 97.9 | |
| PBGC Claim [1] | | 33.0 | |
| Preferred Stock | | 2.2 | |
| Total Debt & Preferred | | 255.7 | |
| Residual Equity Value | $21.8 | $44.3 | $66.8 |
| Shares Outstanding | | 46.63 | |
| **Implied Price/Share** | **$0.47** | **$0.95** | **$1.43** |
| Stock Price (3/21/06) | | $0.09 | |
| **Premium** | **4.2x** | **9.6x** | **14.9x** |

*(1) Calculated based on Disclosure Statement's projected minimum payments over the next 3 years.*

Section I: Executive Summary

5



# II. Valuation Approaches

# Valuation Approaches – Discounted Cash Flow

$ in millions

## Discounted Cash Flow

| | Projected Fiscal Year Ended, | | | | | Terminal Period |
|---|---|---|---|---|---|---|
| | 2007P | 2008P | 2009P | 2010P | 2011P | |
| Revenue | $346.7 | $369.8 | $397.5 | $405.4 | $413.4 | |
| COGS | 223.0 | 236.1 | 254.1 | 259.1 | 264.2 | |
| Gross Profit | 123.7 | 133.7 | 143.4 | 146.3 | 149.2 | |
| Operating Expenses (excl. unusuals) | 96.5 | 95.6 | 97.1 | 99.3 | 101.4 | |
| EBITDA | 27.2 | 38.1 | 46.3 | 47.0 | 47.8 | $47.8 |
| Less: Depreciation and Amortization | 3.5 | 4.5 | 4.5 | 4.5 | 4.5 | |
| EBIT | 23.7 | 33.6 | 41.8 | 42.5 | 43.3 | |
| Income Taxes [1] | 2.6 | 3.7 | 9.4 | 9.5 | 9.7 | |
| Earnings Before Interest | 21.1 | 29.9 | 32.4 | 33.0 | 33.6 | |
| Plus: Depreciation and Amortization | 3.5 | 4.5 | 4.5 | 4.5 | 4.5 | |
| (Less): Capital Expenditures | (9.1) | (3.6) | (4.0) | (5.0) | (5.0) | |
| Add/(Less): Changes in Net Working Capital | 1.8 | (6.2) | (9.5) | (1.6) | (2.6) | |
| Unlevered Free Cash Flow | 17.3 | 24.6 | 23.4 | 30.9 | 30.5 | |
| | | | | | | |
| Discount Period Convention | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.0 |
| Discount Rate / Factor | 0.951 | 0.861 | 0.779 | 0.705 | 0.638 | 0.607 |
| Terminal Value EBITDA Multiple | | | | | | 334.6 |
| Present Values | $16.4 | $21.2 | $18.3 | $21.8 | $19.5 | $203.1 |

| | |
|---|---|
| Discount Rate / Factor | 10.5% |
| Terminal Value EBITDA Multiple | 7.0x |

| | |
|---|---|
| Sum of Discrete Present Values | $97.1 |
| Present Value of Terminal Value | 203.1 |
| Implied Enterprise Value | $300.2 |

### Implied Total Enterprise Value

| | Terminal EBITDA Multiple | | | | |
|---|---|---|---|---|---|
| WACC | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x |
| 9.0% | $287.0 | $302.5 | $318.0 | $333.6 | $349.1 |
| 9.5% | 281.6 | 296.7 | 311.9 | 327.1 | 342.3 |
| 10.0% | 276.3 | 291.1 | 306.0 | 320.8 | 335.7 |
| 10.5% | 271.2 | 285.7 | 300.2 | 314.7 | 329.2 |
| 11.0% | 266.2 | 280.3 | 294.5 | 308.7 | 322.9 |
| 11.5% | 261.3 | 275.1 | 289.0 | 302.9 | 316.8 |
| 12.0% | 256.5 | 270.1 | 283.6 | 297.2 | 310.8 |

(1) Assumes 11.1% effective tax rate in 2007 and 2008 and 22.4% thereafter (from projection assumptions).



# Valuation Approaches – Comparable Company Analysis

*$ in millions.  LTM results as of 10/29/05.*

For purposes of this valuation, we determined *Pro Forma EBITDA* by channel by allocating the Company's unallocated SD&A proportionally by revenue from each channel.

We believe EBITDA may be materially understated on an LTM basis due to disclosures in the Company's fourth quarter 2005 press release that are not similarly disclosed in the Company's fiscal year 2005 10-K.  These inconsistent disclosures present challenges in reconciliation of quarterly and annual results.

For purpose of this analysis, therefore, we relied upon the Company's 10-K and 10-Q disclosures only, and did not rely on press release disclosures.

The inclusion of the Company's press release one-time charges could materially increase EBITDA in this analysis.

### Foodservice

| | Low | Mid | High |
|---|---|---|---|
| LTM Revenue: | | $157.7 | |
| Pro Forma EBITDA: | | 27.5 | |
| EBITDA Multiples: | 7.0x | 7.5x | 8.0x |
| Implied Enterprise Value: | 192.4 | 206.1 | 219.8 |

### Consumer

| | Low | Mid | High |
|---|---|---|---|
| LTM Revenue: | | $121.0 | |
| Pro Forma EBITDA: | | (2.2) | |
| Revenue Multiples: | 0.40x | 0.45x | 0.50x |
| Implied Enterprise Value: | 48.4 | 54.4 | 60.5 |

### International

| | Low | Mid | High |
|---|---|---|---|
| LTM Revenue: | | $80.4 | |
| Pro Forma EBITDA: | | (5.4) | |
| Revenue Multiples: | 0.45x | 0.50x | 0.55x |
| Implied Enterprise Value: | 36.2 | 40.2 | 44.2 |

### Total

| | | | |
|---|---|---|---|
| Total | $276.9 | $300.7 | $324.6 |



# Valuation Approaches – Comparable Transactions

## Comparable Transactions

*($ in millions)*

| Announced | Target | Buyer | Enterprise Value (EV) | Target LTM Results [1] Revenue | EBITDA | Enterprise Value / Revenue | EBITDA |
|-----------|--------|-------|-----------------------|------------------------------|--------|----------------------------|--------|
| 07/21/2005 | Lenox Group Inc. | Department 56 | $190.0 | $350.0 | N/A | 0.54x | N/A |
| 03/06/2006 | Syratech Corporation | Lifetime Brands, Inc. | 55.0 | 138.0 | N/A | 0.40x | N/A |
| | **High** | | **$190.0** | **$350.0** | **N/A** | **0.54x** | **N/A** |
| | **Mean** | | **122.5** | **244.0** | **N/A** | **0.47x** | **N/A** |
| | **Low** | | **55.0** | **138.0** | **N/A** | **0.40x** | **N/A** |

*(1) Lenox Group revenue estimated per SunTrust Robinson Humphrey report dated August 12, 2005.*



# Valuation Approaches – Comparable Company Analysis

According to management, the Company's three primary competitors are Libbey, Lenox and Lifetime Brands.

## Comparable Trading Analysis

*($ in millions, except stock price)*

| | LTM Ended | Stock Price [1] | Market Cap. | Net Debt | Enterprise Value [2] | Enterprise Value / LTM Revenues | Enterprise Value / LTM EBITDA | Enterprise Value / LTM EBIT | Total Debt / EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| Lenox Group Inc. | 12/31/2005 | 13.20 | 184.8 | 109.4 | 381.2 | 1.15 | 6.9 | 7.7 | 2.0x |
| Libbey Inc. | 12/31/2005 | 7.60 | 106.4 | 258.4 | 419.6 | 0.74 | 9.0 | 29.5 | 5.6x |
| Lifetime Brands, Inc. | 12/31/2005 | 26.10 | 339.3 | 18.7 | 358.0 | 1.16 | 11.6 | 14.2 | 0.6x |
| | | | | | | | | | |
| High | | | | | $419.6 | 1.16x | 11.6x | 29.5x | 5.6x |
| Median | | | | | 381.2 | 1.15 | 9.0 | 14.2 | 2.0 |
| Mean | | | | | 386.3 | 1.02 | 9.2 | 17.1 | 2.8 |
| Low | | | | | 358.0 | 0.74 | 6.9 | 7.7 | 0.6 |
| | | | | | | | | | |
| Oneida Ltd. | 10/29/2005 | 0.09 | 4.2 | 219.7 | 259.2 | 0.72 | NM | NM | NM |

Note:   EBITDA and EBIT adjusted for unusual and nonrecurring items.
LTM:   Latest Twelve Months.
NM:   Not Meaningful.
(1)   Stock price as of March 21, 2006.
(2)   Enterprise Value equals equity value plus debt, underfunded pension liabilities, minority interest and preferred stock, less cash.  Assumes debt trades at par value.



# Valuation Approaches – Comparable Company Analysis

## Comparable Operating Results & Margins

*($ in millions)*

| | LTM Ended | Revenues | Gross Profit | LTM Operating Results | | LTM Operating Results | | LTM Operating Results | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Margin | | EBITDA | Margin | EBIT | Margin |
| Lenox Group Inc. | 12/31/2005 | 330.9 | 173.2 | 52.3% | | 54.9 | 16.6% | 49.8 | 15.0% |
| Libbey Inc. | 12/31/2005 | 570.1 | 88.5 | 15.5% | | 46.7 | 8.2% | 14.2 | 2.5% |
| Lifetime Brands, Inc. | 12/31/2005 | 307.9 | 130.4 | 42.4% | | 30.8 | 10.0% | 25.2 | 8.2% |
| High | -- | $570.1 | $173.2 | 52.3% | | $54.9 | 16.6% | $49.8 | 15.0% |
| Median | -- | 330.9 | 130.4 | 42.4% | | 46.7 | 10.0% | 25.2 | 8.2% |
| Mean | -- | 403.0 | 130.7 | 36.7% | | 44.1 | 11.6% | 29.7 | 8.6% |
| Low | -- | 307.9 | 88.5 | 15.5% | | 30.8 | 8.2% | 14.2 | 2.5% |
| Oneida Ltd. | 10/29/2005 | 361.5 | 102.8 | 28.4% | | 3.1 | 0.9% | (3.7) | NM |

*Note: Results are adjusted for unusual and nonrecurring items.*

*LTM: Latest Twelve Months.*

NA: Not Available.

NM: Not Meaningful.



# Comparable Company Descriptions

- **Lenox Group, Inc. –** engages in the design, distribution, wholesale, and retail of collectibles and other giftware products in the United States and Canada. The company offers a series of collectible, handcrafted, and lighted ceramic and porcelain houses; buildings and related accessories that depict nostalgic scenes; lighted pieces and accessories for various holidays and special days, including Halloween, St. Patrick's Day, Easter, Valentine's Day, and Fourth of July. It also sells decorative giftware and home accessory items, including the Snowbabies figurines; holiday and seasonal decorative items; and tableware.

  Lenox Group sells its products through wholesale customers, who operate gift, specialty, and department stores; company-operated retail stores; and direct-to-the-consumer through catalogs, direct mail, and the Internet. As of January 1, 2005, it operated six stores. The company, formerly known as Department 56, Inc., was founded in 1976. It changed its name to Lenox Group, Inc. in November 2005. Lenox Group is headquartered in Eden Prairie, Minnesota.

- **Libbey, Inc. –** engages in the design, manufacture, marketing, and supply of tableware products primarily in the United States, Canada, and the Netherlands. The company designs and markets glass tableware, ceramic dinnerware, metal flatware, and plastic items. Libbey's glass tableware includes tumblers, stemware, mugs, plates, bowls, ashtrays, bud vases, salt and pepper shakers, canisters, and candle holders.

  The company's ceramic dinnerware products include plates, bowls, platters, cups, saucers, and other tableware accessories; metal flatware products include knives, forks, spoons, serving utensils, serving trays, chafing dishes, pitchers, and other metal tableware accessories; and its plastic items include ware washing and storage racks, trays, dispensers, and organizers for the foodservice industry.

  Libbey sells its products through its sales force and manufacturing representatives' organizations to mass merchants, department stores, retail distributors, national retail chains, and specialty houseware stores. The company was established in 1818 and is headquartered in Toledo, Ohio.

- **Lifetime Brands, Inc. –** engages in the design, development, and marketing of consumer products used at home. The company offers kitchenware, cutlery and cutting boards, bakeware and cookware, pantryware and spices, and tabletop and bath accessories. Its kitchenware products include tools and gadgets used in the preparation and serving of meals, glassware products and condiments and barbeque tools and accessories.

  Lifetime Brands's bakeware and cookware products consist of baking, measuring, and rangetop products while the company's pantryware products consist of bread boxes, mug holders, paper towel dispensers, etc. Its bath and decorative window accessories consist of decorative hardware, mirrors, and lighting products. In addition, Lifetime Brands provides flatware comprising knives, forks, and spoons; dinnerware, including plates, bowls, cups, and accessories; and drinkware products, including beverage glasses, as well as pitchers, vases, and related accessories.



# III. Financial Summary

# Financial Summary – Capital Structure

## Capitalization

($ in millions)

| | Claim Value 1/28/06 | Market Price | Market Balance | Plan FY07 Leverage [2] | FY07 Market Leverage [2] |
|---|---|---|---|---|---|
| **Cash and Marketable Securities** | $0.8 | | $0.8 | | |
| Revolving Credit Facility | 5.0 | 100.00 | 5.0 | | |
| Swingline Facility | - | 100.00 | - | | |
| Other Debt | 2.4 | 100.00 | 2.4 | | |
| **Total Senior Secured Debt** | 7.4 | | 7.4 | 2.4x | 2.4x |
| Term Loan A | 115.3 | 100.00 | 115.3 | | |
| **Total Through Term A** | 122.7 | | 122.7 | 4.5x | 4.5x |
| Term Loan B | 97.9 | 77.50 | 75.8 | | |
| **Total Through Term B** | 220.5 | | 198.5 | 8.1x | 7.3x |
| Pension Claim [1] | 33.0 | 100.00 | 33.0 | | |
| **Total Through Pension** | 253.5 | | 231.5 | 9.3x | 8.5x |
| | | Price | | | |
| Preferred Stock | 2.2 | n/a | 2.2 | | |
| **Total Through Preferred** | 255.7 | | 233.7 | 9.4x | 8.6x |
| | | Price | | | |
| Market Capitalization | 4.2 | $0.090 | 4.2 | | |
| **Total Through Common** | 259.9 | | 237.9 | 9.6x | 8.7x |
| **Total Enterprise Value** | 259.1 | | 237.0 | 9.5x | 8.7x |

(1) Calculated based on the Disclosure Statement's projected minimum payments over the next 3 years.
(2) Based on the Disclosure Statement's projected FY07 (ended January 31, 2007) EBITDA of $27.2 million.



# Financial Summary – Foodservice Channel

**Foodservice Channel**

*$ in millions*

| Foodservice | 2003 | 2004 | 2005 | LTM 10/29/05 | Pro Forma [1] 10/29/05 |
|---|---|---|---|---|---|
| **Total Revenue** | 201.4 | 193.3 | 183.1 | 157.7 | 157.7 |
| *Growth Over Prior Year* | *n/a* | *(4.0%)* | *(5.3%)* | *n/a* | *n/a* |
| **Segment Contribution before Unallocated Costs** | 74.4 | 57.5 | 36.8 | 37.9 | 37.9 |
| *Margin %* | *37.0%* | *29.8%* | *20.1%* | *24.1%* | *24.1%* |
| **Estimated D&A** | 5.7 | 4.9 | 5.3 | 2.8 | 2.8 |
| **Unallocated Manufacturing Costs** | 10.4 | 23.4 | 15.3 | 5.5 | - |
| *Margin %* | *5.2%* | *12.1%* | *8.4%* | *3.5%* | *0.0%* |
| **Unallocated SD&A** | 31.5 | 31.0 | 14.9 | 13.3 | 13.3 |
| *Margin %* | *15.7%* | *16.0%* | *8.1%* | *8.4%* | *8.4%* |
| **Adjusted EBITDA** | 38.1 | 8.0 | 11.8 | 22.0 | 27.5 |
| *Margin %* | *18.9%* | *4.2%* | *6.4%* | *13.0%* | *17.4%* |

*Note: Unconsolidated Manufacturing Costs and Unconsolidated Selling, Distribution & Administrative Costs (SD&A) estimated by pro-rata revenue contribution.*

*(1) The Company's Unconsolidated Manufacturing Costs and Unconsolidated SD&A negatively impact EBITDA. Given the Company no longer manufactures its own products, we have provided a pro-forma Adj. EBITDA without the Unallocated Manufacturing Costs. However, we continue to include Unallocated SD&A in our calculation although we believe an acquirer could potentially reduce this amount.*



# Financial Summary – Consumer Channel

## Consumer Channel

$ in millions

| Consumer | 2003 | 2004 | 2005 | LTM 10/29/05 | Pro Forma [1] 10/29/05 |
|---|---|---|---|---|---|
| **Total Revenue** | 202.6 | 175.3 | 147.4 | 121.0 | 121.0 |
| *Growth Over Prior Year* | *n/a* | *(13.3%)* | *(15.9%)* | *n/a* | *n/a* |
| **Segment Contribution before Unallocated Costs** | 37.0 | 24.4 | 3.2 | 5.6 | 5.6 |
| *Margin %* | *18.3%* | *13.9%* | *2.2%* | *4.7%* | *4.7%* |
| **Estimated D&A** | 5.7 | 4.4 | 4.3 | 2.3 | 2.3 |
| **Unallocated Manufacturing Costs** | 10.5 | 21.2 | 12.4 | 4.4 | - |
| *Margin %* | *5.2%* | *12.1%* | *8.4%* | *3.7%* | *0.0%* |
| **Unallocated SD&A** | 31.7 | 28.1 | 12.0 | 10.1 | 10.1 |
| *Margin %* | *15.7%* | *16.0%* | *8.1%* | *8.4%* | *8.4%* |
| **Adjusted EBITDA** | 0.5 | (20.5) | (16.9) | (6.7) | (2.2) |
| *Margin %* | *0.2%* | *(11.7%)* | *(11.5%)* | *(5.5%)* | *(1.9%)* |

*Note: Unconsolidated Manufacturing Costs and Unconsolidated Selling, Distribution & Administrative Costs (SD&A) estimated by pro-rata revenue contribution.*

*(1) The Company's Unconsolidated Manufacturing Costs and Unconsolidated SD&A negatively impact EBITDA. Given the Company no longer manufactures its own products, we have provided a pro-forma Adj. EBITDA without the Unallocated Manufacturing Costs. However, we continue to include Unallocated SD&A in our calculation although we believe an acquirer could potentially reduce this amount.*



Section III: Financial Summary    16

# Financial Summary — International Channel

## International Channel

$ in millions

| International | 2003 | 2004 | 2005 | LTM 10/29/05 | Pro Forma [1] 10/29/05 |
|---|---|---|---|---|---|
| **Total Revenue** | 87.8 | 84.4 | 84.5 | 80.4 | 80.4 |
| *Growth Over Prior Year* | *n/a* | *(3.9%)* | *0.2%* | *n/a* | *n/a* |
| **Segment Contribution before Unallocated Costs** | 16.8 | 15.1 | (3.7) | (0.4) | (0.4) |
| *Margin %* | *19.1%* | *17.9%* | *(4.4%)* | *(0.5%)* | *(0.5%)* |
| **Estimated D&A** | 2.5 | 2.1 | 2.4 | 1.7 | 1.7 |
| **Unallocated Manufacturing Costs** | 4.6 | 10.2 | 7.1 | 4.1 | - |
| *Margin %* | *5.2%* | *12.1%* | *8.4%* | *5.0%* | *0.0%* |
| **Unallocated SD&A** | 13.8 | 13.5 | 6.9 | 6.7 | 6.7 |
| *Margin %* | *15.7%* | *16.0%* | *8.1%* | *8.4%* | *8.4%* |
| **Adjusted EBITDA** | 0.9 | (6.5) | (15.2) | (9.5) | (5.4) |
| *Margin %* | *1.1%* | *(7.7%)* | *(18.0%)* | *(11.8%)* | *(6.7%)* |

*Note: Unconsolidated Manufacturing Costs and Unconsolidated Selling, Distribution & Administrative Costs (SD&A) estimated by pro-rata revenue contribution.*

*(1) The Company's Unconsolidated Manufacturing Costs and Unconsolidated SD&A negatively impact EBITDA. Given the Company no longer manufactures its own products, we have provided a pro-forma Adj. EBITDA without the Unallocated Manufacturing Costs. However, we continue to include Unallocated SD&A in our calculation although we believe an acquirer could potentially reduce this amount.*



Section III: Financial Summary    17

# Financial Summary

## Financial Summary

*($ in millions)*
**For the Fiscal Year Ending January 31,**

| | 2002 | 2003 | 2004 | 2005 | LTM 10/29/05 |
|---|---|---|---|---|---|
| **Total Revenue** | 510.6 | 493.3 | 454.4 | 417.5 | 361.6 |
| *Growth Over Prior Year* | *n/a* | *(3.4%)* | *(7.9%)* | *(8.1%)* | *n/a* |
| **Gross Profit** [1] | 161.8 | 155.2 | 120.1 | 99.0 | 102.8 |
| *Margin %* | *31.7%* | *31.5%* | *26.4%* | *23.7%* | *28.4%* |
| **SD&A** | 134.1 | 129.8 | 134.3 | 124.6 | 106.5 |
| *% of Revenue* | *26.3%* | *26.3%* | *29.6%* | *29.8%* | *29.4%* |
| **EBIT** | 27.7 | 25.4 | (14.2) | (25.6) | (3.7) |
| *Margin %* | *5.4%* | *5.1%* | *(3.1%)* | *(6.1%)* | *(1.0%)* |
| **D&A** | 13.8 | 13.9 | 11.4 | 12.1 | 6.8 |
| **Adj. EBITDA** [1] | | | | (13.5) | 3.1 |
| *Margin %* | | | | *(3.2%)* | *0.9%* |
| Interest Expense | | | | 22.6 | 22.8 |
| Non-Cash Interest | | | | 2.2 | 10.5 |
| CAPX | | | | 3.6 | 2.3 |
| Total Debt | | | | 216.5 | 226.0 |
| Free Cash Flow (EBITDA - CAPX) | | | | (17.1) | 0.9 |
| EBITDA / Cash Interest Expense | | | | NM | 0.3x |
| EBITDA - CAPX / Cash Interest Expense | | | | NM | 0.1x |
| Total Debt / EBITDA | | | | NM | 72.1x |
| Inventory Turns | | | | 2.6x | 2.3x |
| Days Sales Outstanding | | | | 16.9 | NM |
| Days Payable Outstanding | | | | 46.5 | NM |

*(1) Adjusted for non-recurring items and non-cash charges. Sum of business channel Adj. EBITDA does not reconcile exactly due to License Fees and other adjustments not disclosed in the Company's public filings.*


IMPERIAL CAPITAL, LLC

Section III: Financial Summary    18

# Financial Summary – Balance Sheet

*$ in millions*

## Balance Sheet 10/29/05

**For the fiscal period ending:** 10/29/2005

| | |
|---|---|
| **Current Assets** | |
| Cash and Cash Equivalents | $0.8 |
| Trade Accounts Receivables | 55.4 |
| Other Accounts & Notes Receivable | 2.7 |
| Inventories | 102.1 |
| Other Current Assets | 5.4 |
| **Total Current Assets** | **166.4** |
| | |
| **Non Current Assets** | |
| Property, Plant and Equipment, Net | $18.3 |
| Intangible Assets | 116.2 |
| Asset Held for Sale | 5.6 |
| Other Assets | 8.0 |
| **Total Non Current Assets** | **$148.2** |
| | |
| **Total Assets** | **$314.7** |

| | |
|---|---|
| **Current Liabilities** | |
| Accounts Payable and Accrued Liabilities | $13.0 |
| Accrued Liabilities | 27.1 |
| Accrued Restructurings | 1.3 |
| Accrued Pension Liabilities | 18.1 |
| Current Portion of Long-term Debt | 5.2 |
| Short-term Debts | 7.8 |
| Deferred Income Taxes | 1.2 |
| **Total Current Liabilities** | **$73.7** |
| | |
| **Non Current Liabilities** | |
| Long-term Debt | 213.0 |
| Accrued Postretirement Benefits | 2.7 |
| Accrued Pension Liability | 23.8 |
| Deferred Income Taxes | 10.3 |
| Other Liabilities | 12.0 |
| **Total Non Current Liabilities** | **$261.7** |
| | |
| **Total Liabilities** | **$335.4** |
| | |
| **Shareholders' Equity** | |
| Preferred Stock Redeemable | $2.2 |
| Common Stock-par Value | 47.8 |
| Additional Paid in Capital | 84.7 |
| Treasury Stock-common | (21.6) |
| Retained Earnings (Deficit) | (100.1) |
| Other Accumulated Comprehensive | (33.7) |
| **Total Shareholders Equity** | **($20.7)** |
| | |
| **Total Liabilities & Shareholders Equity** | **$314.7** |



# IV. Disclosure Statement Projections

# Disclosure Statement Projections (1)

## Income Statement

| Income Statement ($ in millions) | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Revenue | $346.7 | $369.8 | $397.5 | $405.4 | $413.4 |
| Cost of Goods Sold | (223.0) | (236.1) | (254.1) | (259.1) | (264.2) |
| Gross Profit | 123.7 | 133.7 | 143.4 | 146.3 | 149.2 |
| SG&A | (100.0) | (100.1) | (101.6) | (103.8) | (105.9) |
| Restructuring | (11.4) | (1.4) | - | - | - |
| Impairments | - | - | - | - | - |
| Loss on Sale of Assets | (1.0) | - | - | - | - |
| Total Operating Expenses | (112.4) | (101.5) | (101.6) | (103.8) | (105.9) |
| Operating Income | 11.3 | 32.2 | 41.8 | 42.5 | 43.3 |
| Other Income | 31.1 | - | - | - | - |
| Interest Expense | (20.8) | (15.2) | (14.5) | (13.4) | (12.1) |
| Net Income Before Tax | 21.6 | 17.0 | 27.3 | 29.1 | 31.2 |
| Income Taxes | (2.4) | (2.4) | (5.6) | (6.5) | (7.0) |
| Net Income | $19.2 | $14.6 | $21.7 | $22.6 | $24.2 |
| **EBITDA** | **$27.2** | **$38.1** | **$46.3** | **$47.0** | **$47.8** |

*(1) Source: Oneida, Ltd. et al Disclosure Statement pursuant to Section 1123 of the Bankruptcy Code for the Debtor's joint Pre-Negotiated Plan of Reorganization under Chapter 11 of the Bankruptcy Code.*



# Disclosure Statement Projections

## Balance Sheet

| Balance Sheet ($ in millions) | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Cash | $1.0 | $1.0 | $1.0 | $1.8 | $2.0 |
| Accounts Receivable | 49.7 | 53.4 | 57.4 | 58.5 | 59.7 |
| Inventory | 97.3 | 101.6 | 109.5 | 111.7 | 113.9 |
| Other Current Assets | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Total Current Assets | 153.0 | 161.0 | 172.9 | 177.0 | 180.6 |
| | | | | | |
| PP&E | 25.9 | 25.0 | 24.5 | 24.9 | 25.4 |
| Goodwill | 116.2 | 116.2 | 116.2 | 116.2 | 116.2 |
| Other Assets | 9.6 | 7.9 | 6.4 | 4.9 | 3.4 |
| Total Assets | 304.7 | 310.1 | 320.0 | 323.0 | 325.6 |
| | | | | | |
| Accounts Payable | 13.6 | 14.6 | 15.8 | 16.1 | 16.5 |
| Accrued Liabilities | 34.2 | 33.6 | 33.6 | 33.8 | 34.1 |
| Total Current Liabilities | 47.8 | 48.2 | 49.4 | 49.9 | 50.6 |
| | | | | | |
| Exit Facility Revolver | 37.1 | 30.0 | 18.6 | – | – |
| Exit Facility Term Loan | 89.6 | 88.7 | 87.8 | 86.9 | 65.2 |
| PBGC Note | 2.7 | 2.4 | 2.1 | 1.8 | 1.5 |
| Foreign + Other | 8.5 | 8.5 | 8.5 | 8.5 | 8.5 |
| Other Liabilities | 24.3 | 24.0 | 23.6 | 23.3 | 23.0 |
| Total Liabilities | 210.0 | 201.8 | 190.0 | 170.4 | 148.8 |
| | | | | | |
| Stockholders Equity | 94.7 | 108.3 | 130.0 | 152.6 | 176.8 |
| | | | | | |
| Total Liabilities & Equity | $304.7 | $310.1 | $320.0 | $323.0 | $325.6 |


IMPERIAL CAPITAL, LLC

**EXHIBIT C**







## Jarden, Lifetime Set Fast Pace For M&A Surge That's Far From Over

Monday, July 18, 2005

*Jarden and Lifetime each sees the current economic period as one of opportunity to grow and build multiple-brand parent companies.*

NEW YORK— Cataclysmic. The mergers-and-acquisitions activity our industry is experiencing now has over-reached the conventional and anticipated M&A transactions of larger players buying weaker and smaller ones.

The Jarden acquisition of The Holmes Group and Lifetime Brands' asset purchase of Pfaltzgraff are only the most dramatic swings in this turbulent period of change in the housewares industry.

Most important, is that this surge in M&A activity is far from over. There are still several major housewares companies in play to be acquired. As strategic buyers place their marketing bets, watch for at least two more significant transactions by September.

The Jarden acquisition is the most jarring and will have the longest impact. When I sat to interview Martin Franklin, Jarden chairman and CEO, in New York this spring the company stock was at $45 (it's at $55 a share at presstime). The conversation centered on unconventional marketing, higher profit margins and cross-channeling company backrooms for efficiency among the Jarden-owned firms at the time: AHI (Sunbeam, Coleman, Mr. Coffee, etc.), Tilia and VillaWare.

Franklin was careful to say he was not on a buying expedition to acquire competitors— but, rather, to purchase well-positioned and established brands. His vision was to co-brand lines, leverage brands and come to the consumer in unique ways— including direct marketing on TV.

You had the sense talking with him that backroom efficiencies are, of course, important— but that setting up a front line of unique brands driven by managers within an entrepreneurial culture was the formula that would drive growth, higher profit margins and increased market share.



Franklin has had a lifetime of experience negotiating management teams and their ability to leverage the products in their arsenal. He had acquired consumer brands such as Diamond matches, Ball jars and Bicycle playing cards.

His acquisitions of AHI and Tilia certainly landed him aggressive management teams and talented marketers. And likewise at Holmes, he has struck gold not just in brands (like Crock Pot and Rival in kitchen electrics). Beyond those brands, this is a company with a long history and deep bench of executives with entrepreneurial skills.

Acquiring a factory in China with this transaction is another bonus for Jarden. But the Holmes culture is a significant asset not always discernable on the balance sheet. The $95 million EBITDA of Holmes is attractive, but how the company achieves it is what makes this such a smart buy.

Holmes was born of the seasonal appliance business, and reinvented it. This has always been a temperature-driven business with heaters and fans playing in the annual weather casino. What Jerry Kahn and his team dared to do differently was to upgrade commodity products and turn them into fashion products with colors, designs and new performance features.

Today, throughout that industry, product features drive sales. It wasn't always so.

When Kahn placed one of the biggest bets of his life and acquired Rival, the disappointment of Rival's

domestic marketing and manufacturing facility could have strangled most acquiring firms. Holmes absorbed the initial punch, suffered a retrenchment in performance, and rebuilt the business based on the solid brand franchises. Crock Pot was always a driving name, but Holmes had a lot of work to do with the rest of the Rival line, which was tired when it was acquired.

Kahn and his team righted that ship and continued to grow the business, succeeding where other management teams would have floundered or outright failed.

Today, that winning culture is the real prize for Jarden. You have to know the people to appreciate what a superior acquisition this is.

Lifetime's asset purchase of Pfaltzgraff maintains the company's momentum of buying tabletop and housewares companies. Gemco and Excel were small. Pfaltzgraff, which will generate an estimated $70 million for Lifetime this year alone, is not just larger— it gives Lifetime its own license to nurture and leverage.

Siegel is on a mission to grow Lifetime with rapid-paced acquisitions, changing the face of his company and challenging his team to employ its design expertise to reenergize the brands he has bought.

As head of a public company, Siegel is an executive in a hurry to build both the volume of Lifetime, as well as its success in entering niches with a larger network of brands.

He isn't done yet. Just as Jarden has its eyes on still more growth opportunities, Lifetime sees high-potential, under-performing companies in its marketplace. The question is how quickly Lifetime

can absorb still more takeovers and bring them into our future.

Jarden and Lifetime are public companies at very different ends of the housewares spectrum, but each sees the current economic period as one of opportunity to grow and build multiple-brand parent companies.

This will be the profile of our industry in the years to come:

A cluster of M&A structured, multiple-branded headquarters poised to be ever-opportunistic in buying still more companies. This is our future.





© 2006, homeworldbusiness.com and ICDnet.com. Cannot be reprinted without permission of homeworldbusiness.com and ICDnet.com.

**<u>EXHIBIT D</u>**



Steven R. London, Esq.
direct dial: 617-856-8313
slondon@brownrudnick.com

One
Financial
Center
Boston
Massachusetts
02111
tel 617.856.8200
fax 617.856.8201

December 20, 2005

**By Federal Express, Facsimile and E-Mail**

Christopher H. Smith, Chairman
Terry G. Westbrook, President and Chief Executive Officer
Clarence A. Davis
Gregory M. Harden
William C. Langley
Hugh R. Rovit
Fred Spivak
Nick White
Board of Directors
Oneida Ltd.
163-181 Kenwood Avenue
P.O. Box 935
Oneida, NY 13421

    Re:    <u>Oneida Ltd. (the "Company")</u>

Dear Members of the Company's Board of Directors:

    We represent Jordan Capital, the beneficial owner of 1,324,008 shares of the Company's Common Stock (the "Common Stock"), which constitutes approximately 2.8% of the Company's outstanding shares of Common Stock.

    We are writing to express the significant concern of Jordan Capital about the financial performance and direction of the Company. In particular, Jordan Capital is concerned that the Company may be considering a restructuring of certain of its debt through the issuance of a significant amount of capital stock which would severely dilute current stockholders. Since Jordan Capital believes that there are better options to reduce the Company's debt burden, it is strongly opposed to this type of action and believes that such restructuring would not be in the best interests of the Company's stockholders. Based on informal communications, Jordan Capital understands that other stockholders holding a significant equity position in the Company are of similar mind.

    Under the current capital structure and direction of the Company, Jordan Capital believes the Company has been failing and does not have a viable plan, and as a result the value of the Company's Common Stock has been steadily declining. The holders of Common Stock are the constituents to



Page 2
December 20, 2005

whom the Company and its directors owe fiduciary duties. The ongoing operation of the Company in a manner that continues to ignore the interests of the holders of the Common Stock or the implementation of a restructuring plan that severely dilutes current stockholders is a violation of those duties.

The purpose of this letter is to initiate a meaningful dialog between the Company, Jordan Capital and one or more additional significant stockholders to discuss a strategy which will alleviate the financial burden on the Company and enhance stockholder value. Based on discussions with Imperial Capital, the investment banker for Jordan Capital, and certain informal discussions with other stockholders, Jordan Capital believes that it can propose a strategy to repay or restructure some or all of the Company's debt while enhancing the value of the Company in a manner that is in the best interests of all of the Company's stockholders not just the stockholders who also hold the substantial portion of the Company's debt.

The strategy includes the divestiture of one or more of the business units of the Company and the use of the cash proceeds from the sale to extinguish all or a significant portion of the debt which is burdening the Company. We understand from Imperial Capital that there are a number of strategic buyers who may be interested in purchasing the entire Company or one or more of the consumer, foodservice or international businesses. Based upon Imperial Capital's analysis and understanding of the market, a sale of the foodservice and international business, for example, would yield enough cash proceeds to repay all or a significant portion of the debt, and would permit the Company to redirect its efforts on the remaining consumer business, which, with newly focused attention together with some cost cutting, could enhance the profitability and resulting shareholder value of this business. Similarly, a sale of the entire business would likely yield more value to the Company's stockholders and debt holders than proceeding under the Company's current failing strategy. In short, there may be a number of readily available opportunities that will benefit all stockholders, as well as all debt holders.

Jordan Capital would like to discuss these matters with you in a cooperative manner and is willing to meet with you in person at your earliest convenience. Please contact Paul Davner at Jordan Capital at (914) 472-8212 to schedule a time to meet.

Very truly yours,

BROWN RUDNICK BERLACK ISRAELS LLP

By:

Steven R. London

cc: Paul Davner, Jordan Capital
    Robert Stark, Esq.

**<u>EXHIBIT E</u>**

# SHEARMAN & STERLING LLP

599 LEXINGTON AVENUE | NEW YORK | NY | 10022-6069

WWW.SHEARMAN.COM | T +1.212.848.4000 | F +1.212.848.7179

mtorkin@shearman.com                                December 21, 2005
(212) 848-8283

Steven R. London
BrownRudnick
One Financial Center
Boston, Massachusetts 02111

Via Email slondon@brownrudnick.com

Jordon Capital

Dear Steven:

The Board of Directors of Oneida is in receipt of your letter dated December 20, 2005. First, I assure you and Jordan Capital that the Board of Directors has been fully apprised of its fiduciary duties and at all times has acted and will continue to act in a manner consistent therewith.

As stated in Oneida's Quarterly Report for the period ended October 29, 2005, Oneida is continuing to explore its alternatives to strengthen its balance sheet and enhance its long-term liquidity, including analyzing its ability to further restructure its long term debt and liabilities. To assist in that regard, the Company has engaged Credit Suisse First Boston as its financial advisor.

The Board appreciates Jordan Capital's interest in assisting with this process. At this time, however, the Company is not in a position to schedule a meeting with Jordan Capital but will consider such a meeting at the appropriate juncture.

If you have any questions, I can be reached at the number written above.

Best regards,

Michael H. Torkin

c.c.    The Board of Directors
        C. Suttmeier
        P. Jacob
        D. Bartner

ABU DHABI | BEIJING | BRUSSELS | DÜSSELDORF | FRANKFURT | HONG KONG | LONDON | MANNHEIM | MENLO PARK
MUNICH | NEW YORK | PARIS | ROME | SAN FRANCISCO | SÃO PAULO | SINGAPORE | TOKYO | TORONTO | WASHINGTON, DC

SHEARMAN & STERLING LLP IS A LIMITED LIABILITY PARTNERSHIP ORGANIZED IN THE UNITED STATES UNDER THE LAWS OF THE STATE OF DELAWARE, WHICH LAWS LIMIT THE PERSONAL LIABILITY OF PARTNERS.

**<u>EXHIBIT F</u>**



# WEALTH MONITORS, INC.

11225 College Boulevard • Suite 100 • Overland Park, KS 66210
(913) 345-2822 • FAX (913) 345-2978

March 13, 2006

Michael W. Lamb
Tyson L. Bauer

# Oneida Ltd.
## ONEI

**UPDATE**

*Disclosures are on page 3.*

### *Proposed Recapitalization Plan Completely Unreasonable*

On March 9th, Oneida announced a recapitalization plan to reduce debt by $100 million by having the Tranche B debt exchanged into common shares. The financial institutions representing nearly 100% of both Tranche A and Tranche B have agreed to this recapitalization plan. Oneida plans to file for a pre-negotiated reorganization under Chapter 11. The filing is currently expected to take place on or about March 20, 2006. According to the company's release, this filing should have "no impact on its business operations ... and expects to exit Chapter 11 approximately 90 days after commencement of its case."

"Upon confirmation of the plan, <u>all</u> the common stock would be issued to the holders of Oneida's Tranche B debt. The company's $115 million Tranche A term loan would be refinanced with a long-term revolving credit and term loan facility from Credit Suisse. All of Oneida's existing common and preferred stock will be cancelled and receive no recovery. Accordingly, the company believes that Oneida's currently outstanding preferred and common stock has no value."

Those that have followed the developments in Oneida since before the August 2004 restructuring understood that the company would need to reduce both its debt level and corresponding coupons. The August 2004 restructuring gave a group of financial institutions, on a straight pro-rata basis, $125 million of Tranche A, $80 million of Tranche B and 64% of the common shares. On top of the majority share ownership and all the debt ownership, this new investor group was given the ability to designate 6 of the 9 directors. The current board is comprised 100% of the investor group's designees.

As the new CEO Terry Westbrook stated in the March 9th release, "We've successfully moved from a manufacturing-based business model to one built on sourcing, distribution and marketing. As a result, our cash flow, operating profit and margins have seen steady improvement, but we are still burdened by an unmanageable debt load. The recapitalization now underway is intended to improve our capital structure which in turn will facilitate our continued progress and growth. Oneida is one of the most widely recognized brands in the market place, and we are eager to build on its strength."

The need for Oneida's board to improve the company's balance sheet is obvious – too much debt with strangling coupons. The same group of investors with control of that debt also controls a majority of Oneida's shares. How could there not be a conflict of interest? What appears to be the recapitalization plan is for debtholders to buy 100% of the equity for $100 million, refinance Tranche A (debtholders are paid in full) and the current equity owners are told that their shares have no value. As we see it, the debtholders have received a mid-teens coupon since August 2004, are about to have over half of their investment returned through the refinancing <u>and</u> they will own 100% of the new company.

The enterprise value of Oneida under this plan is approximately $225 million ($100 million equity + $125 million debt). Extrapolating Q3 numbers, EV/Revenues is only 65%. Further, operating income, excluding extraordinary items, in Q3 was over $8 million or $32 million annualized. Therefore, EBIT as a percentage of the proposed equity valuation of $100 million implies a 32% operating income on that new equity amount being proposed. If the new debt carries an 8% coupon (all other factors being equal), Oneida may earn more than $20 million pre-tax or 20% pre-tax ROE. The initiatives already in motion are designed to grow revenues, improve margins and increase profitability.

Basically, Oneida's board is simply saying to its shareholders that even though operational profitability has been achieved, we need to sell the company to the current debtholders for $100 million. It's the best deal we can do. The information vacuum surrounding Oneida for more than a year has limited the amount of information flow to the public arena. One has to assume that the "new" shareholders under the recapitalization plan have extensive information of both current operations as well as strategic initiatives. Again, how can a reasonable person not conclude that there is an obvious conflict here? Oneida's board of directors and a bankruptcy trustee should not allow this quasi-LBO. The board's responsibility is to its shareholders, its current shareholders. A recapitalization plan in concept is reasonable. But the proposal to sell 100% of the company for $100 million to the debtholders is unreasonable. The current operational metrics do not justify the action. We hope a bankruptcy review agrees.

*Wealth Monitors, Inc.*                                                    *March 13, 2006*

# Disclosure Page – Oneida Ltd.

**Stock Ownership:**

| | | |
|---|---|---|
| Shares owned by Wealth Monitors, Inc.: | 0 |
| Shares owned by analysts: | 0 |

\*\*Wealth Monitors, Inc. is not a market maker and does not perform underwriting or manager services.

### *One Year Price Chart and Target History (ONEI)*



| | | |
|---|---|---|
| 1 Year | 03/13/06 | 9/15/04 |
| | $3.5000 | $3.03 |
| | 2.5000 | |
| | 1.7500 | 4/18/05 |
| | 1.2500 | $3.03 |
| | 0.7500 | 6/10/05 |
| | 0.5000 | $3.03 |
| | 0.2500 | |
| | 0.0625 | |

Apr   May   Jun   Jul   Aug   Sep   Oct   Nov   Dec   2006   Feb   Mar

**Risks** include changes in general economic and market conditions, variability in commodity prices such as gold, silver, nickel, brass and natural gas, currency fluctuations, possible debt restructuring dilution and various other risks and uncertainties of which some are not known.

| Company information: | **Terry G. Westbrook,** *President and Chief Executive Officer*<br>**Andrew G. Church,** *Chief Financial Officer*<br>Oneida Ltd. / 163-181 Kenwood Avenue<br>Oneida, NY 13421<br>(315) 361-3000 FAX (315) 361-3700<br>www.oneida.com |
|---|---|

We, Michael Lamb and Tyson Bauer, certify that all the views expressed in this research report accurately reflect our personal views of the subject company. No part of our compensation is, was, or will be, directly or indirectly, specifically related to the views expressed in this research report.

---

Wealth Monitors does not recommend any security purchase (buy), hold/neutral or sell as defined under NASD Rule 2711. Any implied recommendation contained herein may not be suitable for all investors. The information contained herein is based upon sources and data, which we believe to be reliable, but is not guaranteed by us and is not considered to be all-inclusive. This publication and any recommendation contained herein speak only as of the date hereof and are subject to change without notice. Wealth Monitors and employees shall have no obligation to update or amend any information contained herein. This publication is being furnished to you for informational purposes only and on the condition that it will not form a primary basis for any investment decision. Each investor must make his or her own determination of the appropriateness of an investment decision. It is not to be construed as an offer or the solicitation of an offer to sell or buy the securities herein mentioned. The firm and/or its individual shareholders or employees and/or members of their families may effect transactions in the securities mentioned and may make purchases and/or sales from time to time in the open market or otherwise, including transactions contrary to any recommendation herein. Any opinion or estimates constitute our best judgement as of this date, and are subject to change without notice. This material is intended for use by professional or institutional investors only and not the general investing public.