UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

ONEIDA LTD., *et al.*,

                           Debtors.

--------------------------------------------------------x

CHAPTER 11

Case No. 06-10489 (ALG)
(Jointly Administered)

### MEMORANDUM OF OPINION ON PLAN CONFIRMATION

APPEARANCES

SHEARMAN & STERLING LLP
Attorneys for Debtors
         By: Douglas P. Bartner, Esq.
             William J. F. Roll, III, Esq.
             Michael H. Torkin, Esq.
             Bryan R. Kaplan, Esq.
             Lynette C. Kelly, Esq.
599 Lexington Avenue
New York, New York 10022

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Attorneys for the Official Committee of Unsecured Creditors
         By: Scott Hazan, Esq.
             Stanley L. Lane, Jr., Esq.
             Lorenzo Marinuzzi, Esq.
230 Park Avenue
New York, New York 10169

MORGAN, LEWIS & BOCKIUS LLP
Attorneys for JP Morgan Chase Bank, N.A., as Agent
         By: Richard S. Toder, Esq.
             Wendy Snowdon Walker, Esq.
             Jay Teitelbaum, Esq.
101 Park Avenue
New York, New York 10178

PENSION BENEFIT GUARANTY CORPORATION
         By: Lawrence F. Landgraff, Esq.
1200 K Street N.W.
Washington, D.C. 20005

BROWN RUDNICK BERLACK ISRAELS LLP
Attorneys for the Official Committee of Equity Security Holders
        By: Robert J. Stark, Esq.
            Andrew Dash, Esq.
            Emilio A. Galvan, Esq.
Seven Times Square
New York, New York 10036

KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
Attorneys for Peter J. Solomon Company, L.P.
        By: Andrew K. Glenn, Esq.
1633 Broadway
New York, New York 10019

BRACEWELL & GUILIANI, LLP
Attorneys for D.E. Shaw Laminar Portfolios, L.L.C. and Xerion Capital Partners LLC
        By: Mark E. Palmer, Esq.
            David C. Albalah, Esq.
1177 Avenue of the Americas
New York, New York 10036

OFFICE OF THE UNITED STATES TRUSTEE
        By: Richard C. Morrissey, Esq.
33 Whitehall Street, 21st Floor
New York, New York 10004

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

On March 19, 2006, Oneida Ltd. and certain of its direct and indirect domestic

subsidiaries (collectively, the "Debtors") filed petitions for reorganization under Chapter

11 of the Bankruptcy Code.[1]  On the same day, the Debtors filed a plan of reorganization.

On July 7, 2006 they filed a first amended plan of reorganization (the "Plan") and have

moved for its confirmation.

The Plan was the result of pre-filing negotiations between the Debtors and their

secured lenders ("Lenders"), holders of two tranches of debt, Tranche A and Tranche B.

---

[1] In addition to Oneida Ltd., the following entities are Debtors in these related cases: Sakura, Inc.; Buffalo
China, Inc.; Delco International, Ltd.; Kenwood Silver Company, Inc.; Oneida Food Service, Inc.; Oneida
International Inc.; Oneida Silversmiths Inc.; and THC Systems, Inc.

Under the Plan, Tranche A, as the senior debt, is to be paid in full in cash from an exit

facility to be provided by a group of lenders led by Credit Suisse, Cayman Islands

Branch, as administrative agent.  The junior Tranche B debt is to be converted into 100%

of the outstanding common stock of the reorganized company.  The Plan provides that

any general unsecured debt will be paid in full.[2]  The Debtors had also negotiated an

agreement with the Pension Benefit Guaranty Corporation ("PBGC") on the treatment of

its claim for Plan purposes.  The Plan provides that the PBGC will receive an unsecured

variable interest promissory note in the principal amount of $3 million for its $2.7 million

secured claim and for any unsecured claim it would have arising out of the distress

termination of certain of the Debtors' pension plans.  For confirmation purposes, all

interested parties stipulated that the PBGC's unsecured claim would be valued at

$21,075,050, although the Debtors and the PBGC have asserted that the claim could be as

high as $56,237,000.

Shortly after the Chapter 11 cases were filed, an *ad hoc* committee of

shareholders appeared and, arguing that the Debtors are solvent, requested that the United

States Trustee form an official committee of equity security holders.[3]  The U.S. Trustee

denied the request, finding that the appointment of an equity committee should be "the

rare exception" and that there was no "substantial likelihood" that there would be a

"meaningful distribution" in the case to the equity under a strict application of the

absolute priority rule.  The *ad hoc* committee then moved this Court, by motion dated

---

[2] At the time of the filing, the Debtors estimated that they had no fixed, non-contingent unsecured debt,
although there were some disputed claims.  At the confirmation hearing, as further discussed below, it was
established that there was at least about $8.2 million of unsecured claims.  In addition to the unsecured
debt, it was established that there are roughly $18 million in administrative expense claims.

[3] The Committee was comprised of three institutional holders of the Debtors' common stock, all of whom
apparently purchased their stock after the 2004 restructuring discussed below.  The Debtors also have a
small, widely-held issue of preferred stock in the face amount of $2.2 million.

April 14, 2006, for the appointment of a committee pursuant to 11 U.S.C. § 1102(a)(2).[4]

A hearing was held on May 1, 2006, at which the Court heard valuation testimony from

experts called by the Debtors and the ad hoc committee, and testimony from members of

the Debtors' board of directors and management.[5]   The record included an objection to

the appointment of an equity committee by a newly-formed official committee of

unsecured creditors (the "Creditors Committee").

In an unpublished decision, the Court first found that § 1102(a)(2) of the

Bankruptcy Code requires the Court to find that the appointment of an equity committee

is "necessary," a high standard, and that it should give due consideration to the views of

the United States Trustee.  *In re Oneida Ltd.*, 2006 Bankr. LEXIS 780, at *3 (Bankr.

S.D.N.Y. May 4, 2006).  However, it concluded that an official committee of equity

security holders should be appointed because (i) the issue of solvency was seriously

disputed by the parties;[6] and (ii) the *ad hoc* committee had demonstrated that an equity

committee was "necessary" within the meaning of § 1102(a)(2) of the Bankruptcy Code

because of the circumstances of a 2004 restructuring of the Debtors, which had converted

some of the Tranche B debt into 62% of the Debtors' equity, and had given these Lenders

the ability to control the election of six of the Debtors' nine directors.  The Court found

that the filing lacked the checks and balances present in most cases, where the Board is

---

[4] 11 U.S.C. §1102(a)(2) provides, "On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure the adequate representation of creditors or of equity security holders."

[5] The entire record on the motion for the appointment of an official committee of equity security holders was incorporated into the record of the confirmation hearing.

[6] The Court explicitly avoided making any finding with regard to solvency in deciding to appoint an official committee of equity security holders, stating,

> Under the circumstances of this case, it would be unduly prejudicial to all parties to make a preliminary determination on this issue for purposes of this motion, except to find that the issue of solvency is disputed by the parties and that the parties appear well prepared on the issue for a confirmation hearing in the near future.

*Oneida Ltd.*, 2006 Bankr. LEXIS 780, at *6.

elected by the shareholders and there is usually no concern that it will fail to give due

regard to the interests of that constituency.  In reaching this conclusion, the Court made

no finding that the Debtors or the Lenders had acted in bad faith but determined that

> a due regard for appearances also warrants the appointment of an equity
> committee, if only to dispel any implication that, here, a group of creditors
> took control of the Board of Directors in the first stage of a two-stage
> restructuring, neutralized the general unsecured creditors and then took for
> itself the value of the remaining equity.

*Id*. at *10-11.

The United States Trustee appointed an official committee of equity

security holders (the "Equity Committee") on May 18, 2006.  Subsequently, the

Equity Committee took very extensive discovery in preparation for a contested

confirmation hearing.  On the eve of that hearing, the Court was informed of a

potential transaction by which D.E. Shaw Laminar Portfolios, L.L.C. ("D.E.

Shaw") and Xerion Capital Partners LLC ("Xerion" and together with D.E. Shaw,

the "Purchasers") proposed to purchase the Debtors subject to their completion of

due diligence.[7]  The Purchasers thereafter entered into a letter agreement with the

Debtors, approved by the Court, under which the Purchasers would have the week

they requested to complete their due diligence and thereafter, if the diligence was

positive, would make a proposal to purchase the Debtor's controlling equity for a

sum that was described as "at least $222.5 million" or "an amount sufficient to

pay, in full, in cash" the Tranche A and Tranche B claims plus the other debt,

both fixed and unliquidated. (See Proposal to Acquire Reorganized Oneida Ltd.,

dated July 11, 2006, Ex. 95, Docket No. 351.) The proposal also stated that it

---

[7] Xerion was a member of the Equity Committee, but resigned once an offer to purchase the Debtors was
made.  D.E. Shaw is apparently a shareholder of the company but has not been a member of the Equity
Committee.

would provide the Debtors' current equity holders with "an element of consideration" and would be subject to higher and better offers. The Debtors acknowledged receipt of the proposal and agreed that if they received a an offer from the Purchasers but later entered into a "competing proposal" with another buyer, and the Purchasers' proposal was superceded, they would reimburse the Purchasers for up to $250,000 in due diligence expenses.

After considerable discussion among all of the parties, it was agreed that the case would proceed along a dual track, with the confirmation hearing to continue while the Purchasers continued with their due diligence. The Court thereupon had six days of hearings on confirmation of the Plan. When the record of the confirmation hearing was closed on July 25, 2006, the period for the Purchasers' due diligence had passed without their having made a firm offer.[8] It is therefore necessary to determine, based on the facts of record, whether the objections to the Plan should be overruled and the Plan should be confirmed.

The following are the Court's findings of fact and conclusions of law with respect to the issues that have been contested on confirmation of the Debtors' Plan. As set forth in a confirmation order that accompanies this decision, the other requirements of the Bankruptcy Code for confirmation of a plan of reorganization have also been met.

---

[8] As of July 25, 2006, there were three open matters: (i) the Debtors' environmental liabilities and the adequacy of a reserve taken by the company for such liabilities; (ii) discussions with management; and (iii) the PBGC's agreement. The Court thereafter received a letter from Debtors' counsel, dated July 31, 2006, stating that the Purchasers' proposal had effectively been withdrawn, that only one of the original Purchasers remained interested in pursuing a transaction, and that it was interested only in purchasing part of the Tranche B debt with no recovery at all for any equity holders.

## DISCUSSION

Section 1129 of the Bankruptcy Code sets forth numerous requirements for confirmation of a plan of reorganization. The Equity Committee has challenged the Debtors' Plan principally on two grounds: (i) that the good faith requirement of 11 U.S.C. § 1129(a)(3) has not been satisfied and (ii) that there is value for equity holders and therefore that the absolute priority rule as set forth in 11 U.S.C. § 1129(b)(2) has been violated.[9] Peter J. Solomon Co. ("PJSC"), the Debtors' prior investment bankers, also filed an objection to the Plan, claiming that under 11 U.S.C. §§ 1129(a)(11) and (b)(1), the Plan is not feasible and that it unfairly discriminates against PJSC. PJSC's limited objection is dealt with below.[10]

### I. Good Faith

11 U.S.C. § 1129(a)(3) provides that a court shall confirm a plan when, among other things, "[t]he plan has been proposed in good faith and not by any means forbidden by law." The Second Circuit has construed the good faith standard in the bankruptcy context as "requiring a showing that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988); *see also Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935). Good faith should be evaluated "in light of the totality of the circumstances surrounding confirmation." *In re Cellular Info*

---

[9] The Equity Committee also raised questions regarding Plan releases that are considered below.

[10] The Court also received five letters or other submissions from individual equity holders that challenge the Plan on miscellaneous grounds that basically mirror the challenges made by the Equity Committee; one equity holder also appeared personally for part of the confirmation hearing.

*Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (citing cases).  Good faith

has been found to be lacking where a plan is proposed for ulterior purposes.

*Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (quotations

omitted).

        As noted above, an *ad hoc* committee of equity security holders argued at

the outset of these cases that the Tranche B Lenders have control of the Debtors

and have used their control to seize for themselves value that should go to the

equity.  The Equity Committee took up the same position and embarked on a

discovery program that ran up hundreds of thousands (perhaps millions) of dollars

in legal and consultants' fees.  By their own account, counsel for the Equity

Committee reviewed "about thirty boxes of discovery" and took multiple

depositions.  (Tr. of H'rg on July 17, 2006 at 5-11.)  Yet at the confirmation

hearing, the Equity Committee did not produce any evidence that the Debtors had

acted in bad faith or for ulterior purposes or that the Plan constitutes a scheme, on

the part of the Lenders, to acquire an undervalued company, flip it, and make a

substantial profit.  The Equity Committee not only failed to produce a single

document that provides palpable support for this proposition; it did not elicit any

testimony that directly supports its allegation of improper control on the part of

the Lenders or an ulterior purpose on the part of the directors or the Lenders.

        The Debtors amply met their burden of establishing that the Plan has been

proposed in good faith.  For example, the uncontroverted testimony of the

Lenders' financial advisor, Dennis E. Stogsdill of Alvarez & Marsal LLP

("Alvarez & Marsal"), is that the Board, not the Lenders, initiated the idea of

converting the Tranche B debt into equity.  (Tr. of H'rg on July 17, 2006 at 4-22.)[11]  Stogsdill testified that, far from suggesting bankruptcy as a means to convert the remaining Tranche B debt into equity, the Lenders were, in fact, "shocked" and "opposed" to the Debtors' impending bankruptcy filing.  (Tr. of H'rg on July 17, 2006 at 4-21.)  The Court also heard from the Chairman of the Board, Christopher H. Smith, who characterized the Lenders' response to the Debtors' impending filing for bankruptcy as "lukewarm."  (Tr. of H'rg on July 12, 2006 at 1-83.)  Smith testified credibly that although the Lenders were able to appoint six of the nine directors on the Board, all of the Board members were experienced and sophisticated in business matters and that they understood their fiduciary duties and were "absolutely not" controlled by the Tranche B Lenders. (Tr. of H'rg on July 12, 2006 at 1-76-78, 1-81, 1-93-94.)  The Debtors' Chief Financial Officer, Andrew G. Church, testified as well, with equal credibility, that the Debtors prepared their business plans in good faith and independently of the Tranche B Lenders.[12]

In the face of a record that is devoid of any hard evidence of a scheme to acquire value on the cheap, the Equity Committee, at closing argument, fell back on reports that Credit Suisse Securities (USA) LLC ("Credit Suisse"), the Debtors' financial advisor, had prepared at a time when it was pitching for the

---

[11] Conversion of debt to equity is, of course, not an unusual idea, as law professors and economists have argued for years that conversion of debt to equity is the cheapest and fastest way to reorganize a company. *See, e.g.,* Mark J. Roe, *Bankruptcy and Debt: A New Model for Corporate Reorganization*, 83 Colum. L. Rev. 527 (1983); Lucian Arye Bebchuk, *A New Approach to Corporate Reorganizations*, 101 Harv. L. Rev. 775 (1988); Douglas G. Baird, *A World Without Bankruptcy*, 50 Law & Contemp. Probs. 173, 192-93 (1987).

[12] It bears noting that the Equity Committee made no charges against management in connection with the confirmation hearing but took the position that management has done a good job of positioning the company for the future.

Debtors' business and had later updated in reports to the company. These reports speculated that there might be significant value in the company in fiscal years 2008 and 2009. They were introduced into evidence at the May 1, 2006 hearing on the appointment of an equity committee, and all of the documents from that hearing were deemed part of the record on the confirmation hearing. (Tr. of H'rg on July 25, 2006 at 8-69-72; see also Ex. EC-3 at 42; Ex. EC-6 at 47; Ex. EC-9 at 22.) At the confirmation hearing, however, the Equity Committee did not even confront either the Credit Suisse witness, Syed Ali Raz Mehdi, or Stogsdill of Alvarez & Marsal with these documents, and the Committee did not elicit any testimony about them. In any event, on the full record, these analyses were, in the Equity Committee's own words, mere "back-of-the-envelope assessments."(Tr. of H'rg on July 25, 2006 at 8-70.) They do not establish that the Debtors have been undervalued for Plan confirmation purposes or that the Debtors or the Lenders have acted in bad faith.

At closing argument, the Equity Committee also contended that the Board had acted in bad faith in connection with the 2004 restructuring in that (i) the Tranche B Lenders then received 62% of the common stock of the Debtors in exchange for a $30 million loan forgiveness, and (ii) the Debtors did not seek a fairness opinion from an investment banker at that time. In examining this charge, it is worth noting that the uncontroverted evidence in the record is that the Board in 2004, prior to the restructuring in that year, was not affiliated with or appointed by the Lenders. The only evidence is that the unanimous decision of the Board in 2004 to effect a restructuring was taken as being in the best interest

of the company and its stakeholders, and that the conversion price in 2004 was based on the then market price of the equity ($30 million in debt was converted into the number of shares of stock that then had a market value of $30 million). (Decl. of Catherine H. Suttmeier at ¶¶ 11, 13; Tr. of H'rg on July 25, 2006 at 8-38.)[13]   In any event, the record and the case law cited by the Equity Committee do not establish that it is necessary for a company to seek a fairness opinion when it undergoes any type of a recapitalization.[14]   Indeed, by filing its later Chapter 11 case, the company in effect opened its books and records to creditors and shareholders and other parties in interest and gave them a forum to investigate the past.   A thorough (and very expensive) investigation by a well-represented Equity Committee has come up with nothing, and the Committee's objection on the issue of good faith is overruled.

---

[13] The Debtors also received needed liquidity.  Among other things, the 2004 Restructuring split the secured debt into two tranches and provided that interest on Tranche B could be paid in kind for a period of time.

[14] The Equity Committee relies on three cases for the proposition that the Debtors had to seek a fairness opinion from an independent investment banker to ensure that the 2004 restructuring was fair.  See *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 473 N.E.2d 19, 483 N.Y.S.2d 667 (1984); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324 (Del. Ch. 1987).  The relevance of the cases is questionable in that all three involve the duty of a board controlled by majority shareholders to act in a manner fair to minority shareholders in a merger transaction.  In 2004, these Debtors had no "majority shareholders" or "minority shareholders."  In any event, none of the cases is on point.  In *Alpert*, the New York Court of Appeals affirmed the dismissal of a complaint brought by minority shareholders following a freeze-out merger on grounds that the merger, viewed as a whole, was fair to the minority shareholders.  63 N.Y.2d at 567, 574, 473 N.E.2d at 24, 29, 483 N.Y.S.2d at 673, 677.  In reaching this decision, the Court did not mandate the retention of an investment bank to render a fairness opinion but rather suggested (after a long list of other factors as to what determines "fair value" of shares), that "[e]vidence that an independent investment firm was retained to render a fairness opinion on the price offered to the minority may be a good means of demonstrating the price which would have been set by arm's length negotiations."  *Id*. at 571-72.  *Weinberger* and *Sealy* are even further off the mark.  The Court in *Weinberger* held that a cash-out merger did not satisfy any reasonable concept of fair dealing because minority shareholders were denied critical information that the purchaser might have been willing to pay more for the company and the fairness opinion provided was cursory.  457 A.2d at 712.  The Court in *Sealy* held that the defendant company could probably not meet its burden of showing entire fairness in price since the minority shareholders had established otherwise when they demonstrated that the company's fair value, as evidenced by independent valuations, alternative offers for the company and the company's own internal documents, was significantly higher than the book value price offered in the merger.  532 A.2d at 1335.

## II. Valuation

In order to confirm the Plan, the Debtors also had to establish that their Plan, under the absolute priority rule, does not deprive the equity of any recovery to which it is entitled. See §1129(b)(2)(B)(ii); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 441 (1968) ("*TMT Trailer*") ("Since participation by junior interests depends upon the claims of senior interests being fully satisfied, whether a plan of reorganization excluding junior interests is fair and equitable depends upon the value of the reorganized company."). On the record of the confirmation hearing, the Debtors have established that there is no value for the equity.

### A. Valuation Reports

The Court received four reports and heard testimony from four investment bankers on the value of the Debtors. Each of the witnesses was stipulated to be an expert in the field of valuation. Mehdi, from Credit Suisse, called by the Debtors, concluded that their total enterprise value ranged from $190 million to $230 million, with a midpoint value of $210 million. (Ex. D-16 at 13.) Stogsdill of Alvarez & Marsal, the Lenders' financial advisors, who testified as both a fact and an expert witness, concluded that total enterprise value ranged from $190 million to $225 million with a midpoint value of $207 million. (Ex. L-2 at 5.) By contrast, Thomas Thompson of Imperial Capital, LLC ("Imperial Capital"), the Equity Committee's financial advisor, provided a valuation report and concluded that the total enterprise value of the company ranged from $260 million to $330 million, with a midpoint of $295 million. (Ex. D-22 at 12.) David King of Mesirow Financial Consulting, LLC ("Mesirow"), the financial advisor to the Creditors Committee, did not perform a separate valuation but provided a critique of the

Credit Suisse, Alvarez & Marsal and Imperial Capital reports and adjusted each total enterprise value range by correcting what he saw as arithmetic errors, methodological errors, and inconsistencies, and by adjusting subjective assumptions and methodologies. (Statement of Official Committee of Unsecured Creditors in Support of the Debtors' First Amended Joint Prenegotiated Plan of Reorganization, Ex. A at 2.) Mesirow concluded that (i) Credit Suisse's total enterprise value range should be adjusted to a range of $196 million to $227 million, with a midpoint of $212 million; (ii) Alvarez & Marsal's total enterprise value range should be adjusted to a range of $205 million to $243 million, with a midpoint of $224 million; and (iii) Imperial Capital's total enterprise value range should be adjusted to a range of $228 million to $254 million with a midpoint of $241 million. (*Id.*) Mesirow's total enterprise value for the Debtors ranged from $196 million to $254 million, with a midpoint range of $212 million to $241 million.

The evidence as to the debt which had to be satisfied before there could be any recovery for equity was summarized in Debtors' Ex. 91. The Tranche A and Tranche B secured debt at the time of confirmation aggregated $225,178,000, including $8,787,000 of interest. General unsecured claims were estimated at $6,738,868 (with an additional $9,278,500 in disputed or unliquidated claims). The PBGC's claim was conceded to be at least $21,075,050. Administrative claims, including professional fees, were estimated at $17,793,000. With the Debtors' uncontested debt burden aggregating at least $261,506,418, it is obvious why no expert other than Thompson of Imperial Capital found any value in the equity. Even Imperial Capital's low point would have provided no value to the equity.

In comparing and evaluating the evidence, it is important to note at the outset that the valuations have much in common. In order to arrive at a current value for the Debtors, all three valuations rely on a discounted cash flow analysis ("DCF analysis"), a comparable (or selected) company analysis and a precedent transaction (or selected acquisition) analysis. The comparable company analyses and the precedent transaction analyses were not heavily disputed. The experts also generally agreed that the DCF analysis was the most probative as to value. For the reasons stated below, the Court finds the valuations submitted by Credit Suisse, Alvarez & Marsal, and Mesirow to be reliable and discounts the Imperial Capital valuation presented by Thompson.

*(i) The DCF Analysis*

A DCF analysis attempts to arrive at value by projecting the future cash flows of an enterprise and then discounting back to a present value. For future cash flows, all of the experts started with the projections provided by the Debtors that were agreed to be "aggressive but (hopefully) achievable." The experts further agreed that in order to arrive at an appropriate discount rate, it is necessary to calculate a "weighted average cost of capital" (a "WACC analysis") and that the basic components of such a calculation are the projected costs of debt and equity and the split between the two. All of the experts used substantially the same cost of equity, with a range of 19.9% to 20.5%. They also agreed that the Debtors' cost of debt would be substantially lower than the cost of equity. (Tr. of H'rg on July 25, 2006 at 8-86.)

One of Thompson's principal disagreements with the other experts was in his use of a rate of 7.9% for the debt portion of the projected cost of capital and his assumption that debt could provide approximately 60% of the Debtors' future capital needs. (Tr. of

H'rg on July 18, 2006 at 6-27.)  His conclusion that the Debtors could capitalize the

company's future capital needs with debt at this low an interest rate lacks adequate

support.  The market shows that these Debtors, at this time, have been able to obtain exit

financing at a rate of 12-13% (LIBOR plus seven percent).  (Tr. of H'rg on July 13, 2006

at 2-39 and 3-25.)  There was no suggestion that management, which the Equity

Committee lauded for doing a fine job, was overpaying for the Debtors' exit facility.

Thompson argued on the basis of several texts on valuation that it is not proper to use the

actual debt facilities of an enterprise in performing a WACC analysis, and that a

valuation should be based only on the cost of debt for comparable companies.  (Tr. of

H'rg on July 18, 2006 at 6-11-12.)  However, Thompson himself used the exit facility as

a comparable in his May 1 testimony regarding the Debtors.  He also sent an email to one

of his associates at about the time Imperial Capital issued its June report, asking, "We are

using the cost of debt of the comps vs. cs [Credit Suisse] and alvarez using the cost of

actual borrowing.  What is our rationale?  Do we have academic support for this?  I

testified previously that the cost should approximate the cost of the entire facility."  (Ex.

L-7.)  The testimony Thompson referred to was the evidence he gave at the May 1

hearing on appointment of an equity committee.

    While there is support in the literature to use the cost of debt of comparable

companies in a WACC analysis, the comparables Thompson used to arrive at a 7.9% cost

of debt are problematic at best.    For example, Thompson used debt issued by Lifetime

Brands, Inc. at a 4% interest rate, despite the fact that this was convertible debt, which

has both an equity and a debt component that have different pricing points.  (Tr. of H'rg

on July 21, 2006 at 7-75 to 7-76.)  Thompson merely took "the face value of the coupon."

(Id. at 7-77, line 13). The most nearly comparable company, Libbey, Inc., had a recent debt financing with a cost of debt at around 14%. Use of the Lifetime convertible debt skewed the results of Thompson's analysis.

In the present case, the Debtors' exit facility appears to have been priced by the market under circumstances favorable to them, in that they have completed their organizational restructuring begun in 2004 and are using "aggressive" projections that show considerable growth in the future. Under all of the circumstances, the use by Credit Suisse and Alvarez & Marsal of the interest rate that will be charged on the Debtors' actual exit facility appears more reasonable than Thompson's reliance on problematic comparables.

In addition, there is very little support for Thompson's use of a 60/40 debt to equity split in his WACC calculation. Thompson admitted that he changed the split from a 40/60 debt to equity split in his March 2006 report, used at the May 1, 2006 hearing on the appointment of an official committee of equity security holders, to a 60/40 split in his June report. He contended that the market had "changed" with respect to the industry comparable companies, in that several such companies had been able to borrow money at low interest rates. (Tr. of H'rg on July 17, 2006 at 5-59, 5-60.) It is pure speculation, however, that these Debtors will be able to borrow so much at such low rates in the near-term future.[15] It is also speculation that they would achieve a "B" bond rating, which was also part of Thompson's conclusion.[16] King of Mesirow, who supported Thompson on

---

[15] The exit facility is in the principal amount of $170,000,000, but the Debtor's ability to borrow will be restricted by ratios based on the results of their future operations. The Court does not assume they will be able to borrow the full principal amount of the facility on exiting bankruptcy but does assume, based on the record and as further discussed below, that they will be able to borrow enough to pay the Tranche A debt and all other claims payable as a result of plan confirmation.

[16] Thompson was able to conclude that these comparables achieved such a high percentage of debt financing only by including underfunded pension liabilities as debt, which seems dubious no matter what

several points, concluded that a 70/30 equity to debt split for the company's capital structure would be reasonable in a WACC calculation.[17]

The Equity Committee contended during closing argument that the Court should look at the cost of debt and debt-to-equity weightings of comparable companies so as "to remove the stigma of bankruptcy and the non-recurring nature of restructuring," and put the company "back into the flow of commerce in its industry." (Tr. of H'rg on July 25, 2006 at 8-85, 8-87, 8-96.) The Committee, however, elicited no testimony during its direct examination of Thompson or its cross examination of the other expert witnesses to support the proposition that this should be a specific goal of a valuation process and that it justifies the adjustments that Thompson made. In this case, there was no dispute that the Debtors' operating restructuring began two years ago and is substantially complete and that its projections of future performance are aggressive. There is no reason to believe that the cost of the Credit Suisse exit facility is an unfair indicator of the cost of debt of the Reorganized Debtors at this time and for a reasonable period going forward.

The goal of any valuation is to make an estimate "based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and conditions of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of

---

academic support there may be for including pension liabilities as debt in other contexts. In any event, Thompson also included unfunded pension liabilities in the numerator portion of his WACC calculation but did not add back interest and other expenses associated with the unfunded pension liabilities to the denominator. (Tr. of H'rg on July 21, 2006 at 7-94.) The other experts did not include unfunded pension liabilities in their WACC calculations but did include the unfunded pension liabilities in the total cost of debt, which they then used to calculate total enterprise value. (Tr. of H'rg on July 21, 2006 at 7-92.)

[17] Thompson made two other dubious adjustments to the Debtors' already aggressive projections that affected his DCF analysis. First, he assumed without any evidentiary support that the Debtors could stretch out payment terms on their overseas trade debt. Second, he adjusted the Debtors' assumptions with respect to the cost of nickel, speculating that the price of this commodity would decrease over time. (Tr. of H'rg on July 21, 2006 at 7-72, 7-73.)

future performance." *TMT Trailer*, 390 U.S. at 442, quoting *Consol. Rock Products Co. v. Du Bois*, 312 U.S. 510, 526 (1941). In the present case, the Court finds the DCF analyses of Credit Suisse and Alvarez & Marsal, as supplemented by the Mesirow report, to be reliable.

*(ii) Comparable Company and Precedent Transaction Analyses—Thompson's "Normalization" of EBITDA and Revenue*

Like the other experts, Thompson made two further analyses of the Debtors' total enterprise value: a "comparable company analysis" that applies trading multiples for public companies that are similar to the Debtors, and a "precedent transaction" analysis that examines prices paid in recent merger and acquisition transactions of similar companies in similar industries. Both analyses took the Debtors' projections and then superimposed valuation multiples based on comparable company results and transactions. All of the experts used, for the most part, the same companies and the same transactions as comparables, and there was little disagreement on the basic methodology.[18] However, in his report, Thompson made certain adjustments that are unjustified in light of the fact that the Debtors' projections are already aggressive.

In his analysis, Thompson "normalized" the Debtor's revenue and EBITDA (earnings before interest, taxes, depreciation, and amortization) used in the analyses by

---

[18] It should be noted that Credit Suisse deviated from Alvarez & Marsal and Imperial and used two tiers of companies. All of the experts used Credit Suisse's tier one companies, comprised of Libbey Inc., Lifetime Brands, Inc. and Lenox Group Inc. Credit Suisse however, included tier two companies, comprised of De Longhi Spa, Helen of Troy Corp Ltd and SEB S.A., in the comparable company analysis and the selected acquisition analysis. The Equity Committee properly challenged Credit Suisse's use of the tier two companies. For example, the Lifetime Brands acquisition of Pfaltzgraff and Syratech Corporation and the Department 56 acquisition of Lenox Group should not have been included in the selected acquisition analysis because the Pfaltzgraff and Syratech acquisitions were too small and Syratech Corporation was EBITDA negative before the acquisition. If those transactions were removed from the analyses, the total enterprise value of the Debtor calculated by Credit Suisse would have been higher, but only marginally so. (Tr. of H'rg on July 18, 2006 at 6-6-9.)

reaching back and reaching forward five years.  (Tr. of H'rg on July 25, 2006 at 8-42.)

Thompson reasoned that the past years show under-performance by the company and the

future years show substantial growth, and that a blending of the revenue and EBITDA of

the past and future years would create a "normalized" performance.  (Tr. of H'rg on July

25, 2006 at 8-100-101.)  On cross-examination, however, Thompson admitted that he had

never before used a normalization analysis in a published valuation report. (Tr. of Hr'g

on July 21, 2006 at 7-86-87.)  His support for this adjustment included a 1920 publication

by the U.S. Treasury Department on estimating the intangible value of goodwill that

breweries and distilleries lost because of the imposition of Prohibition in the United

States.  (Ex. L-6 at 282.)  At closing argument, the Equity Committee pointed to

additional literature for the proposition that it is appropriate to replace current with

"normalized" earnings by looking at a company's history if the company is in a

restructuring.  (Tr. of H'rg on July 25, 2006 at 8-101-02; Ex. L-5.)  Thompson, however,

reached back to years when the Debtors generated revenue from business segments that

have since been closed, contributing to his increase in fiscal year 2007 EBITDA to $34.6

million from the Debtors' projected $26.7 million and an increase in fiscal year 2007

revenue to $377 million from a projected $343 million.  Thompson's "normalization"

adjustments are not supported on this record.

### B. Credibility

In addition to problems with his valuation methodology, Thompson's credibility

was successfully challenged by the Plan proponents.  Most significantly, Thompson's

employer, Imperial Capital, entered into a contingency agreement relating to its fee after

Thompson had expressly agreed that the firm would do no such thing.  The circumstances

were as follows.  At the May hearing, the Debtors introduced on cross examination

stinging criticism leveled at Thompson by the District Court in *Milfam II LP v. Am.*

*Commercial Lines, LLC (In re Am. Commercial Lines, LLC)*, 4:05-cv-0030-DFH-WGH

(S.D. Ind. March 30, 2006).  (Ex. D-33.)  Affirming on appeal the Bankruptcy Court's

confirmation of a Chapter 11 reorganization plan, the Indiana District Court found that

Thompson's testimony lacked any credibility because, among other things, he was

retained on a contingent fee basis.[19]  The Court found that this "highly unusual contingent

fee for an expert witness raises obvious issues of credibility," and that the bankruptcy

court "was entitled to discredit anything he said on the basis of this unusual

arrangement."  (Ex. D-33 at 4, 5.)  When confronted with this decision at the May 1

hearing, Thompson emphatically stated that he would "absolutely not" enter into a

contingency fee arrangement in this case.  (Ex. D-70 at 1-84.)  Nevertheless, he entered

into exactly such an arrangement; when Imperial Capital was hired by the official Equity

Committee, its fee included, in addition to a monthly advisory fee, a "success fee" of one

percent of any equity recovery.  (Tr. of H'rg on July 18, 2006 at 6-62.)  This contingent

fee, and the circumstances surrounding it, seriously undermine Thompson's credibility.

*See Person v Assoc. of Bar of City of N.Y.*, 554 F.2d 534, 538 (2d Cir. 1977), *cert denied*,

434 U.S. 924 (U.S. 1977); *Cresswell v. Sullivan & Cromwell*, 704 F. Supp. 392, 401

(S.D.N.Y. 1989), *rev'd on other grounds*, 922 F.2d 60 (2d Cir. 1990).[20]

---

[19] Thompson's clients had purchased some of the distressed debt of a company after the bankruptcy
proceedings had commenced.  Imperial Capital was to be paid 10% of the total consideration his clients
would receive above that provided by a pending plan, and if the clients recovered 6% of the fully diluted
equity, Imperial Capital would receive 25% of the additional amount.  (Ex. D-33 at 4.)  Thompson testified
in that case that the plan provided too little value to the debt.

[20] An email dated June 26, 2006, sent by Thompson to a company with a possible interest in purchasing
certain of the Debtors' assets, did not help his credibility, either.  Thompson said that Imperial Capital was
"in the midst of a discussion with the Company regarding your interest and I am expecting to hear their
reaction shortly."  (Ex. D-37 at IC010492, IC010369.)  After explaining on cross examination that "in the

### C. The Purchasers' Contingent Offer for the Company

Beyond the theoretical, the Court has had the benefit of the appearance of parties who made a contingent offer for the Debtors. The Court recognizes that the offer was never made in a definitive form and was withdrawn, and also that it does not have a full record as to the reasons why it was withdrawn. Nevertheless, the Court finds that the circumstances relating to the offer at least confirm that there is no value for equity on the facts of this case.

First, the Purchasers' written proposal was made by existing equity holders who were well acquainted with the Debtors and had more than adequate funds to pay the purchase price. There is no question that the offer—albeit contingent on the completion of due diligence—was depressed on account of a lack of information or a lack of financing.

Second, the offer never covered all of the debt. The Purchaser's written proposal used the same numbers to quantify debt that the Debtors used in their Trial Ex. D-91. The Purchasers' offer, however, was contingent on the PGBC's willingness to accept a $4 million note for an unsecured claim stipulated to be more than $20 million in amount. The PBGC's willingness to abide by a prepetition agreement with the Debtors to take a $3 million note did not obligate the PBGC to make similar concessions to the Purchasers, especially as the Purchasers proposed to provide consideration to a junior class.

Third, the consideration that would actually have been offered to the old equity was *de minimis*. The Purchasers' written proposal merely offered "an element of

_____

midst of" can "be interpreted a number of ways," Thompson admitted that Imperial Capital had intended to have such a discussion with the Debtors but had not engaged in one at the time he sent the email message. (Tr. of H'rg on July 18, 2006 at 6-100-06.)

consideration." The Court was informed, on the record, that the Purchasers' original offer was clarified in the subsequent week and that the proposal to the equity would include (i) $2.2 million in face amount of a junior, subordinated stock for the existing preferred shareholders that would be effectively subordinated to a senior equity (held by the Purchasers) and would be payable only if the Purchasers sold the reorganized Debtors or arranged an IPO or if the company had cash flow that would permit substantial dividends to the senior equity; and (ii) $6 million in face amount of a junior subordinated equity for the common shareholders that would not be payable if the preferred shareholders voted against the Plan and would be payable only if, upon a liquidity event (such as the sale of the company), the Purchasers received at least their original equity investment plus a very substantial return (the Purchasers proposed a 15% annual return). (Tr. of Hr'g on July 25, 2006 at 8-15 through 8-18.)  The Debtors contended on the record that the value of the consideration to the common stockholders ranged from less than one cent per share, or $490,000 using the Debtors' valuation numbers, to about 3.5 cents per share, using Thompson's valuation numbers.  The Equity Committee not only failed to object to this valuation but stated that it endorsed the proposal. (Tr. of Hr'g on July 25, 2006 at 8-10 through 8-17.)  Earlier the Equity Committee had described the Purchasers as "monied, sophisticated people" and stated that they had made a "white knight proposal" which "solves all of our problems." (Tr. Of H'rg on July 12, 2006 at 1-9, 1-17.)

The Equity Committee also stressed that one part of the Purchasers' proposal was to allow other bidders to come forward, and that their offer (if made) was subject to higher and better offers.  It is sheer speculation to contend that there might be other white knights in the wings.  The Equity Committee never argued that an auction process was

required as a matter of law in this case or that an auction is required whenever there is a

valuation dispute in connection with a confirmation hearing.  This is unquestionably not

the law.  Any such rule would make the Chapter 11 process irrelevant, as all cases could

be handled in a Chapter 7 liquidation context.  In the present case the Debtors enunciated

sound reasons why a short, pre-negotiated Chapter 11 proceeding was important to their

continued business recovery and to their ability to retain credibility with their customers

and suppliers.  The Debtors negotiated such a plan—one that converted debt, paid the few

general unsecured creditors in full and resolved the Debtors' complex problems with the

PBGC.  Although the Equity Committee has had an opportunity to subject the Debtors'

Plan to the closest scrutiny (at the Debtors' expense), it has come up with no reason to

delay the proceedings any further or to deny confirmation of this Plan.

As the Court observed in *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 n.3

(7th Cir. 1987), "people who must back their beliefs with their purses are more likely to

assess the value of the [asset] accurately than are people who simply seek to make an

argument."  One of the members of the Equity Committee resigned and did make a

tentative proposal that would have backed its argument.  Even this offer has been

withdrawn.  In any event, it offered only speculative value to the equity.  Although the

Court does not need this history to make its factual findings as to value, it does confirm

the following conclusions: (i) that there is no value for the equity, and (ii) the Plan

satisfies the absolute priority rule.

## III.  Release and Exculpation Clauses

The Equity Committee raised, but did not pursue at the confirmation hearing, the

argument that the release and exculpation provisions in §§ 10.2 and 10.4 of the Plan are

invalid under the controlling authority of *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993), and *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005). In *Drexel*, the Second Circuit held that in bankruptcy cases, "a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtors' reorganization plan." 960 F.2d at 293. The Second Circuit further held in *Metromedia* that while "none of our cases explains when a nondebtor release is 'important' to a debtors' plan, it is clear that such a release is proper only in rare cases." 416 F.3d at 141. It concluded that such cases include situations where (i) "the estate received substantial consideration," (ii) "the enjoined claims were 'channeled' to a settlement fund rather than extinguished," (iii) "the enjoined claims would directly impact the debtors' reorganization 'by way of indemnity or contribution,'" or (iv) "the plan otherwise provided for the full payment of the enjoined claims." *Id.* at 142 (internal citations omitted). It further held that "[n]ondebtor releases may also be tolerated if the affected creditors consent." 416 F.3d at 142.

The third-party releases in the Plan fall directly into this final category. Section 10.2 of the Plan provides for releases of claims held by creditors who affirmatively indicate their willingness to grant such releases by "checking a box" on their Plan solicitation ballots. The creditors who were solicited for this consent comprised a small group of Lenders, and every such affected creditor voted to approve the Plan and specifically agreed to the releases provided for in § 10.2(b) of the Plan. (See Debtors' Omnibus Response to Objections to Debtors' Joint Prenegotiated Plan of Reorganization

under Chapter 11 of the Bankruptcy Code at 28.)[21]  There is no issue as to these releases

under applicable Second Circuit authority.[22]

## IV. The PJSC Objection

PJSC filed a "limited objection" to confirmation on two grounds that the Equity

Committee did not raise.  First, PJSC argued that its disputed claim for breach of contract

damages dwarfs other unsecured claims and that the Debtors should be required to

reserve cash in the entire amount of the claim as there is no guarantee that the Debtors

will have the financial resources to pay PJSC's claim if it is allowed post-confirmation.

Second, PJSC contends that the Plan discriminates against creditors holding disputed

claims, as the Plan provides that disputed claims will not receive post-petition interest

while other general unsecured creditors will.[23]

The first objection is grounded in feasibility.  11 U.S.C. § 1129(a)(11)

provides that the court shall confirm a plan if

> confirmation of the plan is not likely to be followed by the liquidation, or
> the need for further financial reorganization, of the debtor or any successor
> to the debtor under the plan, unless such liquidation or reorganization is
> proposed in the plan.

---

[21] The only impaired creditors under the Plan, and the only creditors who voted and gave releases, are the Lenders.  Under the Plan, the Debtors also released their own claims against third parties, but these do not raise any "third-party release" issues of the type discussed here.

[22] The Equity Committee initially also complained that § 10.4 of the Plan, an exculpatory clause, was too broad and "[u]nlike the exculpation clauses in most plans." (Objection to Plan at ¶54.)  The clause releases claims relating to any

> pre-petition or post-petition act or omission in connection with, or arising out of, the
> Disclosure Statement, the Plan or any Plan Document ... the solicitation of votes for and
> the pursuit of Confirmation of [the] Plan, the Effective Date of [the] Plan, or the
> administration of [the] Plan or the property to be distributed under [the] Plan.

No release is provided for gross negligence, willful misconduct, fraud, or criminal conduct, and the release covers only conduct taken in connection with the Chapter 11 cases.  The Confirmation Order expressly excludes claims related to the 2004 Restructuring, and the language of the clause, which generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptionable. *See In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005).  The Equity Committee's objection, if any, is overruled.

[23] PJSC also objected to the limited substantive consolidation of the Debtors' estates provided for in the Plan but withdrew the objection before the confirmation hearing.

PJSC argued in its opposition brief that the Debtors' future results are speculative, taking the exact opposite approach to that taken by the Equity Committee.  In any event, it did not adduce any evidence at the hearing to support its position, and the uncontroverted testimony was that the Debtors would have enough cash to pay all claims post-confirmation through their exit facility and cash generated from possible asset sales.  (Tr. of H'rg on July 13, 2006 at 2-39.)  There is no issue as to feasibility and no need for a special escrow for PJSC.

PJSC also claims that the Plan unfairly discriminates against it because the Plan does not provide for post-petition interest on its disputed claim.  It argues that without interest, its claim is impaired under 11 U.S.C. § 1124 and that in such case it should have been entitled to vote on the Plan.  Section 1124 of the Bankruptcy Code provides that a creditor is unimpaired only if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claims or interest entitles the holder of such claim or interest."

The Debtors respond that under 11 U.S.C. § 502(b)(2), which generally prohibits payment of post-petition interest on prepetition unsecured claims, post-petition interest is payable to unsecured creditors only in the cases where the estate is solvent.  See 4 *Collier on Bankruptcy* ¶ 502.03[3][c], at 502-26, 30 (15th ed. rev. 2006).  The Debtors contend that because their assets do not exceed their liabilities, PJSC is not entitled to post-petition interest, and there is no discrimination because the Plan does not provide for the payment of post-petition interest to any general unsecured creditors.

There is no discrimination in the Plan because holders of general unsecured claims, whether disputed or not, are treated in the same manner. See Plan §3.3(f)(1).  The

Debtors also correctly argue that, since they are insolvent, there are no equitable circumstances present that require payment of post-petition interest. *See Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 163 (1946); *In re Kentucky Lumber Co.*, 860 F.2d 674, 677 (6th Cir. 1988); *In re Chateaugay Corp.*, 150 B.R. 529, 537 (B.R. 1993).

However, the Plan is based on the premise that the unsecured creditors are unimpaired, and on this basis, the unsecured creditor class was not solicited and did not vote on the Plan.  As noted above, a creditor is unimpaired only if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim ... entitles the holder."  If a right has been altered, "…returning to pre-default conditions" is the cure. *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982).  This means that if a creditor has a right to interest on its claim under applicable non-bankruptcy law, it must be paid interest for the post-petition, as well as the prepetition, period. *See In re Chateaugay Corp,* 150 B.R. 529, 543 (Bankr. S.D.N.Y 1993), *aff'd,* 170 B.R. 551 (S.D.N.Y. 1994); 4 *Collier on Bankruptcy* ¶ 1124.03[4], at 1124-14, 15.  Once paid that interest, it returns to the position it previously occupied and is unimpaired.  The wording of the Plan concerning interest payments to the general unsecured creditors is vague and possibly ambiguous.  The Court makes no finding whether PJSC's claim, if any, is interest-bearing under non-bankruptcy law.  However, if any unsecured creditor has an entitlement to interest under applicable non-bankruptcy law, such interest will have to be paid, and the Plan will have to be construed to provide for such payment.

**CONCLUSION**

For the reasons stated above, the Court overrules all objections to the Plan and finds that the Plan meets all of the applicable requirements of 11 U.S.C. § 1129, provided that the Plan is construed to require the payment of interest to unimpaired creditors in accordance with applicable non-bankruptcy law.  The Debtors' First Amended Plan is confirmed and an appropriate confirmation order will be entered.

Dated: New York, New York
        August 30, 2006

            */s/ Allan L. Gropper*
        UNITED STATES BANKRUPTCY JUDGE