**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                                                    Chapter 11

ONEIDA LTD., *et al.*,                                       Case No. 06-10489 (ALG)

               Reorganized Debtors.

---------------------------------------------------------------x

**POST-TRIAL MEMORANDUM OF OPINION**

A P P E A R A N C E S:

SHEARMAN & STERLING LLP
Attorneys for Oneida Ltd.
 By: William J.F. Roll, III
     Seth M. Kean, Esq.
     Irina Dragulev, Esq.
599 Lexington Avenue
New York, New York 10022

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for Peter J. Solomon Company, L.P.
 By: Andrew K. Glenn, Esq.
     Daniel N. Zinman, Esq.
     Kristina R. Juntunen, Esq.
1633 Broadway
New York, New York 10019


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

      The reorganized debtors in the above-captioned Chapter 11 proceedings

("Oneida") object to a proof of claim filed by a former financial advisor, Peter J.

Solomon Company, L.P. ("PJSC"). The proof of claim alleges that Oneida is liable under

an Amended and Restated Engagement Letter (the "Letter Agreement"), dated May 1,

2004. As PJSC interprets a "tail provision" of the Letter Agreement, it has a contractual

right to recover more than $6.3 million in fees because Oneida hired another investment banker to advise it in connection with its Chapter 11 case. Oneida counters that any obligation to PJSC under the Letter Agreement ended in 2004, when PJSC completed and was paid in full for the work it was hired to perform.

Upon the findings of fact and conclusions of law set forth below, the Court rejects PJSC's contractual interpretation and sustains Oneida's objection.

## **BACKGROUND**

Oneida objects to proof of claim number 42 (the "Claim"), filed by PJSC in the above-captioned case on April 28, 2006. The Claim is premised on PJSC's interpretation of the Letter Agreement, which Oneida and PJSC executed on May 1, 2004, almost two years prior to Oneida's bankruptcy filing. The first paragraph of the Letter Agreement establishes that Oneida hired PJSC as its

> financial advisor in connection with a transaction or series or combination of transactions, whereby, directly or indirectly, (i) [Oneida] renegotiates and/or restructures its senior Secured Bank Debt, (a 'Restructuring Transaction'); (ii) [Oneida] or any of its subsidiaries or affiliates raises capital from any bank, financial institution or other financing source (a 'Financial Transaction'); and (iii) control of or a material interest in the assets, business or securities of [Oneida] or any of its affiliates is acquired by or combined with any person or entity or any of its affiliates (a 'Buyer'), including without limitation, through a sale or exchange of capital stock or assets, a merger or consolidation, a tender or exchange offer, a leverage buy-out, or any other business combination or similar transaction (a 'Sale Transaction' and, together with a Restructuring Transaction and Financial Transaction, a 'Transaction'). (Oneida's Trial Ex. 5, First Paragraph).

Section 3 of the Letter Agreement sets forth the fee arrangement negotiated by the parties—"as compensation for the services rendered" and during the term of the engagement, PJSC would be entitled to "[a] monthly fee (the 'Monthly Fee') equal to

2

$125,000.00 per month, payable in advance," as well as a "Transaction Fee" for any of the three Transactions as contemplated and defined in the first paragraph of the Letter Agreement. (Oneida's Trial Ex. 5, § 3). As to the term of the engagement, § 6 of the Letter Agreement provides that

> [t]he term of this Agreement shall extend from the date hereof and shall continue thereafter on a month-to-month basis; provided that (i) either [Oneida] or PJSC may terminate this Agreement upon 30 days notice delivered in writing; (ii) upon termination, PJSC shall be entitled to any fees for any monthly period which are due and owing to PJSC upon the effective date of termination, such amounts to be pro-rated for any incomplete monthly period of service; (iii) termination of PJSC's engagement hereunder shall not affect [Oneida's] continuing obligations under Section 7 and Exhibit A hereof;[1] (iv) PJSC shall be entitled to its full fees under Section 3 hereof in the event that any Transaction is consummated at any time prior to the expiration of one year after such termination, or a letter of intent or definite agreement with respect to any Transaction is executed at any time prior to one year after such termination (which letter of intent or definitive agreement subsequently results in the consummation of such Transaction at any time) …. (Oneida's Trial Ex. 5, § 6).

The last subsection quoted above, subsection (iv) of § 6 of the Letter Agreement, sets forth the "tail provision" that PJSC relies on for its multi-million dollar claim. It provides PJSC the right to collect its full fee if the Letter Agreement is terminated in writing and a "Transaction" is consummated within thirteen months of "such termination."

On August 9, 2004, Oneida completed an out-of-court financial restructuring (the "2004 Transaction") in connection with which (i) $30 million of its outstanding secured, senior debt was exchanged for approximately 62% of Oneida's common stock; and (ii)

---

[1] Exhibit A establishes PJSC's indemnity rights and is incorporated in the Letter Agreement in § 5, as follows:

> [Oneida] agrees to the provisions of Exhibit A hereto, which is an integral part of this Agreement and the terms of which are incorporated by reference herein. Such Exhibit A shall survive any termination, expiration or completion of PJSC's engagement hereunder.

3

the remaining outstanding senior debt was restructured into a revolving credit facility and two term loans.  Three days after the 2004 Transaction, PJSC issued an invoice to Oneida in the sum of $1,240,436.12.  Oneida paid the bill in two installments—one on August 24, 2004 and the other on December 8, 2004, after PJSC had revised the bill to address certain concerns Oneida had voiced.  After the original August 2004 bill was rendered, PJSC stopped requesting, and Oneida stopped disbursing, the Monthly Fee provided for in the Letter Agreement.  The only work PJSC performed for Oneida after the 2004 Transaction was a written response to a request from Oneida's outside auditor relating to PJSC's engagement.  PJSC did not bill for its time in connection with this work, but it asked Oneida to reimburse it $700 in expenses, and Oneida paid PJSC this sum on December 13, 2004.

The 2004 Transaction did not cure Oneida's financial difficulties.  In the spring of 2005, Oneida was back in the market seeking a financial advisor.  During this process, Oneida and PJSC discussed the possibility of working together again, and Oneida invited PJSC to compete for the job as financial advisor with three other candidates.  However, the "tail provision" in the Letter Agreement complicated PJSC's candidacy.  In a conversation between one of its outside directors and a PJSC officer, in early April 2005, Oneida asked PJSC to waive any application of the "tail provision" of the Letter Agreement, but PJSC refused.  The PJSC executive in charge, in an email communication to superiors dated April 4, 2005, summarized the state of affairs with Oneida at that point in time:

> oneida is going to hire a banker to assists with strategic
> alternatives…as we discussed with you, there is a new board of 9
> (only 2 holdovers), a new ceo, and the bank group has changed
> leadership. new board members each appeared to have favorite

4

> firms…csfb, rothshild and bear will be interviewed along with us.
> we do have a tail in our old agreement that may date thru august of
> this year…to be discussed later. (Oneida's Trial Ex. 12).

By the end of April, PJSC had presumably held its internal "discussions" about the "tail" and was insisting that the "tail" was applicable and that it would continue to apply since Oneida had never formally sent a written notice of termination of the Letter Agreement. In response, on April 27, 2005, Oneida's General Counsel sent a letter to PJSC stating its position as follows:

> For the avoidance of doubt, [Oneida] hereby gives written notice of
> termination in accordance with Section 6 [of the Letter Agreement].
> However, it is Oneida's position that this agreement terminated on
> August 9, 2004. In addition, it is the company's position that PJSC
> is not entitled to any further compensation under the agreement. As
> you know Oneida and PJSC had a good working relationship during
> the engagement and it is unfortunate that we are having this
> disagreement. (Oneida's Trial Ex. 13)

The same day, PJSC replied to Oneida by letter stating its position:

> We received your letter of April 27, 2005 in reference to the [Letter
> Agreement] and acknowledge the termination notice contained
> therein. All of us here have enjoyed working with Oneida.
> Nevertheless, we do not agree with the statements made in your
> letter and reserve all of our rights and remedies with respect to the
> above letter agreement. (PJSC's Trial Ex. 28).

Notwithstanding the dispute over the applicability of the "tail," Oneida interviewed PJSC as a potential financial advisor, but it was not selected, and on August 1, 2005, Oneida retained Credit Suisse First Boston ("CSFB"). Sometime thereafter, Oneida began negotiations with its lenders and the Pension Benefit Guaranty Corporation, and ultimately it executed a Plan Support Agreement that its principal creditors agreed to support if Oneida filed for bankruptcy. On March 19, 2006, Oneida and eight affiliates then filed voluntary Chapter 11 bankruptcy petitions. The documents

5

filed with the petitions included a prenegotiated plan of reorganization; a motion for approval of a debtor-in-possession credit agreement; and an application to retain CSFB as Oneida's exclusive financial advisor in the bankruptcy cases. Oneida also filed a motion for the approval of an exit financing commitment on March 27, 2006. The Court approved, on a final basis, the DIP Facility and CSFB's employment application on April 7 and May 2, 2006, respectively. On August 30, 2006, after a trial to determine objections to confirmation filed by a committee of equity security holders and by PJSC, the Court confirmed Oneida's First Amended Joint Prenegotiated Plan of Reorganization. *In re Oneida, Ltd.*, 351 B.R. 79 (Bankr.S.D.N.Y. 2006). The Court approved Oneida's Exit Financing Facility and final fee applications for professionals in October 2006; fees awarded included $1.45 million to CSFB for its work as Oneida's financial advisor.

As noted above, PJSC filed its proof of claim on April 28, 2006 and Oneida objected on September 15, 2006; PJSC filed its response on September 29, 2006. The Court held a two-day trial on the objection in November 2008 after the parties were unable to negotiate a resolution.

In brief, the positions of the parties are as follows. PJSC construes the Letter Agreement as requiring Oneida to provide written notice of termination to end the engagement. Absent such a termination notice, under the tail provision of the Letter Agreement, the firm would be entitled to its fees calculated on the basis of the 2004 Letter Agreement for any "transaction" entered into by Oneida within the tail period of thirteen months. PJSC thus contends that it is entitled to the fee because Oneida did not provide written notice of termination until April 27, 2005 and then, during the next thirteen months, filed its Chapter 11 cases, confirmed a Plan and restructured its debt a

6

second time. PJSC calculates its claimed fee of $6.3 million based on the three principal agreements Oneida executed in 2006 as part of its bankruptcy case—the Plan Support Agreement, the Debtor-in-Possession Credit Agreement, and the Exit Financing Commitment (collectively the "2006 Chapter 11 Transactions").

Oneida, on the other hand, argues that the Letter does not require written termination and that its obligations to PJSC terminated in 2004 when PJSC completed the work it was hired to perform, sent a bill and was paid in full.

For the reasons and upon the findings and conclusions set forth herein, Oneida's objection is sustained.[2]

## **DISCUSSION**

A proof of claim is prima facie evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion. Fed.R.Bankr.P. 3001(f); *see Abboud v. Abboud (In re Abboud)*, 232 B.R. 793, 796 (Bankr.N.D.Okla.1999), *aff'd*, 237 B.R. 777 (10th Cir. BAP 1999); *In re Adelphia Communication Corp.*, 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb.2007). The burden then shifts to the claimant if the objector produces "evidence equal in force to the prima facie case…which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1992), quoting *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991). When the burden is shifted back to the claimant, it must then prove by a preponderance of the evidence that under applicable law the claim should

---

[2] In addition to its contractual arguments, Oneida contends (i) that PJSC waived and abandoned its alleged contractual rights; (ii) that PJSC is equitably stopped from asserting the claim; (iii) that if the proof of claim is not disallowed, PJSC would be unjustly enriched for work it did not perform; (iv) that PJSC's claim is barred by provisions of the Bankruptcy Code governing the retention of professional advisors; and (v) that the amount claimed is vastly overstated. Since the Court rejects PJSC's contractual interpretation and disallows its claim altogether, these arguments need not be addressed.

7

be allowed. *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *In re Holm*, 931 F.2d at 623; *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

In this case the issues are easily and wholly resolved by construction of the contract at issue in accordance with well-accepted principles of interpretation. Under New York law,[3] "a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed." *Morlee Sales Corp. v. Manufactures Trust Co.*, 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 172 N.E.2d 280 (1978).

> "The court should construe the agreements so as to give full meaning and effect to the material provisions. A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324-25, 834 N.Y.S.2d 44, 865 N.E.2d 1210 (2007) (internal quotations and citations omitted).

Moreover, "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003) (citations omitted). "The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transp., Inc. v. Am. Phil. Fiber Indus.*, 743 F.2d 85, 91 (2d Cir. 1984), quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913). Thus, courts may examine events that take place subsequent to the execution of a contract to ascertain the intent of the parties. *Marine Midland Bank-Southern v. Thurlow*, 53 N.Y.2d 381, 387, 442

---

[3] There is no dispute that the law of New York governs the controversy, as it governs the Letter Agreement (See Letter Agreement § 7(c)).

N.Y.S.2d 417, 419-20 (1981); *Cantrade Private Bank Lausanne Ltd. v. Torresy*, 876 F. Supp. 564, 573 (S.D.N.Y. 1995).[4]

In the case at hand, the terms of the contract are unambiguous and consistent with the parties' pre-dispute actions as to the scope of the engagement, the terms of the employment, and the application of the tail provision. All support Oneida's position.

Thus, the Letter is clear as to the scope of Oneida's retention of PJSC. PJSC was hired as a "financial advisor in connection with a transaction or series or combination of transactions." (Oneida's Trial Ex. 5, First Paragraph). The paragraph refers to a Restructuring Transaction, a Financial Transaction and a Sale Transaction, which are collectively defined as a "Transaction."[5] There was no dispute that PJSC's engagement was limited and that the firm was not hired to provide ongoing general financial advisory services. PJSC's Managing Partner confirmed this at trial:

Q: What was [PJSC] hired to do in 2004?

---

[4] PJSC contends that such evidence is barred by the parole evidence rule, but the Court can receive evidence of the parties' own actions taken under a contract, and such evidence does not serve to alter or vary but to illuminate the parties' intent. *See Ocean Transp., Inc. v. Am. Phil. Fiber Indus.*, 743 F.2d at 91. Thus PJSC's trial Motion to Strike Parol and Extrinsic Evidence, on which the Court reserved decision, had no merit.

[5] The relevant portion of the first paragraph of the Letter Agreement states that PJSC is retained as

> **financial advisor in connection with a transaction or series or combination of transactions, whereby, directly or indirectly**, (i) [Oneida] renegotiates and/or restructures its senior Secured Bank Debt, (**a 'Restructuring Transaction'**); (ii) [Oneida] or any of its subsidiaries or affiliates raises capital from any bank, financial institution or other financing source (**a 'Financial Transaction'**); and (iii) control of or a material interest in the assets, business or securities of [Oneida] or any of its affiliates is acquired by or combines with any person or entity or any of its affiliates (a 'Buyer'), including without limitation, through a sale or exchange of capital stock or assets, a merger or consolidation, a tender or exchange offer, a leverage buy-out, or any other business combination or similar transaction (**a 'Sale Transaction' and, together with a Restructuring Transaction and Financial Transaction, a 'Transaction'**). (Oneida's Trial Ex. 5, First Paragraph) (emphasis added).

9

> A: We were hired to either refinance the company's existing bank debt, to complete a restructuring transaction principally with the company's existing lenders, or sell the company. (Trial Tr. 21:25-22:4, Nov. 6, 2008).

Oneida's General Counsel also testified to the same effect:

> Q: Was Peter J. Solomon hired in connection with the 2004 engagement to be a general all-purpose financial advisor?
>
> A: No, they were not. (Trial Tr. 203:12-15, Nov. 6, 2008).

PJSC has never produced any evidence or advanced any argument to support a different interpretation of the Letter Agreement.

Under the Letter Agreement, it was a "Transaction" that entitled PJSC to a success or "transaction" fee at the end of the engagement, as well as to the monthly fee it had been receiving. There is no dispute that PJSC was paid both its monthly fee and a transaction fee at the end of the engagement. The evidence is uncontradicted that PJSC was paid a total of $1.23 million in 2004 for successful completion of the 2004 Transaction and that it stopped billing thereafter. PJSC thus correctly viewed the contract as completed and fulfilled. PJSC's explanation in its post-trial brief that the Monthly Fee was not billed after August as an "accommodation" to Oneida is not credible, particularly when contrasted with the fact that before the 2004 Transaction, PJSC religiously demanded that Oneida timely pay the Monthly Fee. (Oneida's Trial Ex. 7; Trial Tr. 108:4-109:8, Nov. 6, 2008).

Notwithstanding its own treatment of the engagement as completed in 2004, PJSC seizes on § 6 of the Letter Agreement and claims that Oneida could terminate the agreement only be sending a written notice. Section 6 establishes that the engagement "shall extend from the date hereof and shall continue thereafter on a month-to-month basis; provided that (i) either [Oneida] or PJSC **may** terminate this Agreement upon 30

10

days notice delivered in writing ….." (Oneida's Trial Ex. 5, § 6) (emphasis added). However, PJSC ignores the fact that completion of the contract by full performance discharged Oneida's duty thereunder. Restatement (Second) of *Contracts* § 235(1) (1981) ("full performance of a duty under a contract discharges the duty"). Insertion of a written mandatory termination provision in the Letter Agreement, as PJSC argues, would nullify the scope of PJSC's engagement as set forth in the first paragraph of the Letter Agreement, extend the scope of the engagement beyond the completion of a Transaction, and convert the Letter Agreement into an open-ended advisory contract. Under PJSC's construction, the Court would also have to ignore § 5 of the Letter Agreement, which incorporates Exhibit A (establishing PJSC's indemnity rights) and provides: "[s]uch Exhibit A shall survive **any termination,** expiration **or completion** of PJSC's engagement hereunder." (Oneida's Trial Ex. 5, § 5) (emphasis added). This provision, which was included for PJSC's benefit, shows that the parties contemplated that the engagement could end by the completion of a transaction.

Discharge of Oneida's obligations under the Letter Agreement by completion is also consistent with the wording of § 6 on termination, which provides that Oneida "may" terminate the engagement at any time on 30 days' written notice. The word "may" is usually employed as a permissive or discretionary term. *See, e.g., N.Y. State Elec. & Gas Corp. v. Aesen*, 157 A.D.2d 965, 966, 550 N.Y.S.2d 223 (3d Dep't 1990). The selection of the term "may" over "shall" to qualify the termination provision of the Letter Agreement plainly shows that the parties intended to allow rather than require written termination.

11

PJSC cites several cases in support of its contention that the Court should read the Letter Agreement as requiring written notice of termination. None of them is on point. *In re Van Vleet*, 383 B.R. 782, 791 (Bankr.D.Co. 2008) (Colorado law), and *Stribula v. Wien*, 107 Misc. 2d 114, 116, 438 N.Y.S.2d 52 (1st Dep't 1980), address issues in month-to-month leases of real property, which are governed by statutory rules (e.g., rent control laws) or policy considerations completely foreign to the ones applicable to the case at hand. *Cibro Petroleum Prods. Inc. v. Sohio Alaska Petroleum Co.*, 602 F.Supp. 1520, 1531 (N.D.N.Y. 1985), involved an open-ended supply contract subject to the Emergency Petroleum Allocation Act. *Joy v. Heidrick & Struggles, Inc.*, 93 Misc. 2d 818, 822-23 N.Y.S.2d 613 (1977), concerned an open-ended employment agreement. None involved a tail provision in a fully-performed agreement of limited scope.[6] In any event, the authority cited is not applicable to the dispute at hand because the termination provision of the Letter is not mandatory.

Construction of the Letter Agreement as not requiring written termination after completion of a "Transaction" is also consistent with the obvious purpose of § 6 and the tail provision contained therein. Section 6 gives either party the right to terminate PJSC's services even before the completion of a "transaction" and the earning of a fee. However, if the contract is terminated prior to the occurrence of a "Transaction," and PJSC is not able to earn a transaction fee, PJSC has certain rights and certain protections. One of these is the tail—if a "Transaction" is consummated within thirteen months of written termination, PJSC is nevertheless entitled to its fee. This is wholly consistent with the purpose of a tail provision. *See, e.g., Picotte Real Estate, Inc. v. Gaugham*, 107

---

[6] Nor is § 15.301(4) of the New York General Obligation Law applicable, as there is no need to reach the question whether the requirement of written notice was "waived."

12

A.D.2d 996, 996-997, 484 N.Y.S.2d 718 (3d Dep't 1985) (the purpose of a tail provision is to ensure that a principal does not receive the benefit of an agent's services and then refuse to pay for those services); s*ee also Shipman v. Wikeson*, 112 N.Y.S. 895, 897 (Sup. Ct. Niagara Co. 1908) ("It is a shield to protect the agent, not a sword to injure his principal.").

On the other hand, PJSC's position in this case that the Letter Agreement continued even after completion because Oneida did not terminate it in writing leads to an absurd result. On PJSC's reading, it is entitled to a second fee (even larger than the first) because Oneida entered into a second "transaction," even though its work under the contract had been completed long before and merely because Oneida failed to timely "terminate" a contract that both parties had treated as completed. This construction of the contract must be rejected on grounds that it leads to an absurd result. *Lipper Holding, LLC*, 1 A.D.3d at 171. Oneida did not intend to pay PJSC twice, once for its work on a transaction and then a second time for work that it did not perform and for which another firm was paid. It would also be inconsistent with the words of the contract. Section 6(iv) of the Letter Agreement, the so-called tail provision, provides that "PJSC shall be entitled to its full fee under Section 3 hereof in the event that any **Transaction** is consummated at any time prior to the expiration of one year after such termination…." (Oneida's Trial Ex. 5, § 6(iv)) (emphasis added). When this subsection is read in context—that is, when it is read in connection with the Letter's first paragraph and its definition of "Transaction"—it is clear that PJSC would be entitled to one Transaction fee only.

Indeed, the only argument that PJSC could possibly have made for a fee based on the 2006 Chapter 11 Transactions is that they were part of a "series of transactions"

13

within the meaning of the first paragraph of the Letter Agreement and that its total fee should be measured on that premise.[7] PJSC wisely refrained from this contention. Among other things, it was barred by this Court's finding in its opinion confirming the Oneida Plan that the 2006 Chapter 11 Transactions were entered into in good faith and that there was no evidence to support the proposition that a group of creditors took control of the debtor in the first stage of a two-stage restructuring and then took for itself the value of the remaining equity in the Chapter 11 second stage. The Court rejected this proposition in its opinion confirming the Oneida Plan, over the objection of PJSC, among others. *In re Oneida Ltd.*, 351 B.R. at 83, 85-86. This finding has not been challenged herein and is binding on all parties to the Chapter 11 proceedings in any event. *See e.g., Stoll v. Gottileb*, 305 U.S. 165, 170-171 (1938); *In re Am. Preferred Prescrip., Inc.*, 255 F.3d 87, 92 (2d Cir. 2001).

## CONCLUSION

For the reasons stated above, the objection to PJSC's proof of claim is sustained and the claim is expunged.

IT IS SO ORDERED.

Dated: New York, New York
      February 6, 2009

                                              */s/ Allan L. Gropper*
                                              ALLAN L. GROPPER
                                              UNITED STATES BANKRUPTCY JUDGE

---

[7] It will be recalled that the first paragraph of the Letter Agreement provides that PJSC is hired "in connection with a transaction or series or combination of transactions …."